Aaron M. Bloom (*admitted pro hac vice*)
New York Bar No. 4247714
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
abloom@earthjustice.org
Phone: (917) 410-8727

Timothy J. Preso (*admitted pro hac vice*)
Montana Bar No. 5255
Earthjustice
313 East Main Street
Bozeman, MT  59715
tpreso@earthjustice.org
Phone:  (406) 586-9699
Fax: (406) 586-9695

*Attorneys for Plaintiffs Center for Biological
Diversity and Defenders of Wildlife*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Center for Biological Diversity, et al. | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| Deb Haaland, Secretary of the Interior, et al., | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| State of Arizona, | ) |
| | ) |
| Intervenor-Defendant. | ) |

No. 4:22-cv-00303-TUC-JAS
No. 4:22-cv-00453-TUC-JAS

PLAINTIFFS' BRIEF IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iii

INTRODUCTION .............................................................................................. 1

BACKGROUND ................................................................................................. 2

I.    The Endangered Mexican Wolf ............................................................. 2

II.   The Mexican Wolf Reintroduction Program......................................... 3

III.  Unresolved Threats to the Mexican Wolf ............................................. 3

      A.    Genetic Problems ........................................................................ 4

      B.    Excessive Killings and Removals ............................................... 5

      C.    Arbitrary Geographic Limits ....................................................... 6

IV.   The Invalidated 2015 10(j) Rule ........................................................... 7

V.    The 2017 Recovery Plan ....................................................................... 9

VI.   The 2022 Revised 10(j) Rule .............................................................. 12

ARGUMENT .................................................................................................... 14

I.    Standard of Review .............................................................................. 14

II.   Plaintiffs Have Standing ...................................................................... 14

III.  FWS Violated the ESA ........................................................................ 15

      A.    The ESA's Recovery Mandate ................................................. 15

      B.    The Revised 10(j) Rule's Population and Genetic Objectives
            Arbitrarily Reflect FWS's Misapplication of the Flawed Miller PVA....... 16

            1.    FWS Arbitrarily Relied on a Model that Incorporated
                  Irrational Assumptions and Underestimated Extinction Risk
                  and Genetic Loss. .......................................................... 17

            2.    FWS Irrationally Set the Genetic and Population Objectives
                  at Levels Even the Miller PVA Predicted Would Result in
                  Genetic Decline, Contrary to the ESA's Recovery Mandate........... 22

    3. FWS Irrationally Set the Population and Genetic Objectives at the Bare Minimum Levels That the Miller PVA Predicted Would Achieve FWS's Inadequate Goals. ...................................... 24

  C. The Genetic Objective Arbitrarily Uses an Unreliable Proxy in Lieu of Actual Genetic Outcomes. ........................................................... 26

  D. The Revised Rule's Take Provisions are Unsupported and Fail to Provide for Species Recovery. ........................................................ 30

  E. FWS Arbitrarily Retained the I-40 Boundary and Failed to Consider its Recovery-Impeding Impact. ................................................. 30

IV. FWS Violated NEPA ................................................................................. 36

  A. FWS Failed to Take a Hard Look at the Impacts of the Revised 10(j) Rule and Failed to Ensure the Scientific Integrity of its Analysis. ............. 37

  B. FWS Unlawfully Failed to Consider a Reasonable Range of Alternatives. ................................................................................ 38

    1. Only One of the Alternatives Even Attempted to Comply with the ESA. ......................................................................... 39

    2. FWS Arbitrarily Failed to Consider Reasonable, More Wolf-Protective Alternatives. ............................................................. 40

V. The Court Should Remand the Revised 10(j) Rule ................................... 41

CONCLUSION ......................................................................................... 41

1

## TABLE OF AUTHORITIES

2

### CASES

3

*Columbia Falls Aluminum Co. v. E.P.A.*,
4
    139 F.3d 914 (D.C. Cir. 1998) .................................................................. 17

5

*Ctr. for Biological Diversity v. Haaland*,
6
    562 F. Supp. 3d 68 (D. Ariz. 2021) ..................................................... 12, 29

7

*Ctr. for Biological Diversity v. Jewell*, No. 15-cv-19, 2018 WL 1586651
8
    (D. Ariz. Mar. 31, 2018) ...................................... 8, 9, 14, 16, 18, 21, 22, 23, 30, 31, 40

9

*Ctr. for Biological Diversity v. Zinke*,
    2019 WL 12265875 (D. Ariz. Mar. 29, 2019) ........................................... 32
10

*Ctr. for Biological Diversity v. Zinke*,
11
    399 F. Supp. 3d 940 (D. Ariz. 2019) ..................................................... 12, 30

12

*Ctr. for Biological Diversity v. Zinke*,
13
    900 F.3d 1053 (9th Cir. 2018) ........................................... 17, 20, 21, 22, 36

14

*Env't. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
15
    36 F.4th 850 (9th Cir. 2022) ........................................................... 39, 40, 41

16

*Flaherty v. Bryson*,
17
    850 F. Supp. 2d 38 (D.D.C. 2012) ............................................................. 40

18

*Fund for Animals v. Babbitt*,
    903 F. Supp. 96 (D.D.C. 1995), *amended* 967 F. Supp. 6 (D.D.C. 1997) ................. 29
19

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
20
    378 F.3d 1059 (9th Cir. 2004), *amended on other grounds,* 387 F.3d
21
    968 (9th. Cir. 2004) ............................................................................ 15, 29

22

*Greater Yellowstone Coal., Inc. v. Servheen*,
23
    665 F.3d 1015 (9th Cir. 2011) ................................................................... 19

24

*Kern v. U.S. Bureau of Land Mgmt.*,
    284 F.3d 1062 (9th Cir. 2002) ................................................................... 37
25

*Marsh v. Or. Nat. Res. Council*,
26
    490 U.S. 360 (1989) .................................................................................. 37

27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
28
    463 U.S. 29 (1983) ........................................................... 14, 19, 24, 29, 31

iii

*N. Alaska Env't. Ctr. v. Kempthorne,*
    457 F.3d 969 (9th Cir. 2006) ............................................................. 37

*Nat. Res. Def. Council v. U.S. Forest Serv.,*
    421 F.3d 797 (9th Cir. 2005) ....................................................... 39, 40

*Nat'l Parks Conservation Ass'n v. Bureau of Land Mgmt.,*
    606 F.3d 1058 (9th Cir. 2010) ........................................................... 41

*Nat'l Parks Conservation Ass'n v. E.P.A.,*
    788 F.3d 1134 (9th Cir. 2015) ........................................................... 17

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
    184 F. Supp. 3d 861 (D. Or. 2016) ................................................... 26

*Native Ecosystems Council v. Dombeck,*
    304 F.3d 886 (9th Cir. 2002) ............................................................. 14

*Native Ecosystems Council v. Tidwell,*
    599 F.3d 926 (9th Cir. 2010) ....................................................... 36, 37

*Native Ecosystems Council v. U.S. Forest Serv.,*
    418 F.3d 953 (9th Cir. 2005) ............................................................. 37

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) .......................................................................... 37

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
    747 F.3d 581 (9th Cir. 2014) ............................................. 17, 20, 22

*Sierra Club v. Clark,*
    755 F.2d 608 (8th Cir. 1985) ............................................................. 16

*Sierra Forest Legacy v. Sherman,*
    646 F.3d 1161 (9th Cir. 2011) ........................................................... 36

*Tenn. Valley Auth. v. Hill,*
    437 U.S. 153 (1978) .......................................................................... 15

*Trout Unlimited v. Lohn,*
    559 F.3d 946 (9th Cir. 2009) ....................................................... 16, 19

*Tucson Herpetological Soc'y v. Salazar,*
    566 F.3d 870 (9th Cir. 2009) ............................................... 26, 35, 36

iv

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*W. Watersheds Project v. Abbey,*
    719 F.3d 1035 (9th Cir. 2013) ......................................................... 38, 40

*Westlands Water Dist. v. U.S. Dep't of Interior,*
    376 F.3d 853 (9th Cir. 2004) ................................................................. 41

*WildEarth Guardians v. Haaland,*
    No. 22-15029, 2023 WL 8613628 (9th Cir. Dec. 13, 2023) ................... 12, 30

### STATUTES AND LEGISLATIVE MATERIALS

5 U.S.C. § 706(2)(A) ......................................................................................... 14

16 U.S.C. § 1531(b) .......................................................................................... 15

16 U.S.C. § 1531(c)(1) ...................................................................................... 15

16 U.S.C. § 1532(3) ........................................................................................... 16

16 U.S.C. § 1533(d) ............................................................................... 16, 32, 40

16 U.S.C. § 1539(j) .............................................................................................. 3

16 U.S.C. § 1539(j)(2)(A) ............................................................................. 16, 32

16 U.S.C. § 1539(j)(2)(C) .................................................................................. 16

42 U.S.C. § 4332(C) .......................................................................................... 37

42 U.S.C. § 4332(C)(iii) ..................................................................................... 39

42 U.S.C. § 4332(D) .......................................................................................... 37

S. Rep. No. 97-418 ............................................................................................ 30

### REGULATIONS AND ADMINISTRATIVE MATERIALS

40 C.F.R. § 1500.1(a) (2014) ........................................................................... 36

40 C.F.R. § 1500.1(b) (2014) ........................................................................... 37

40 C.F.R. § 1502.14 (2014) .............................................................................. 39

40 C.F.R. § 1502.14(a) (2014) .......................................................................... 39

40 C.F.R. § 1506.13 (2022) .............................................................................. 38

1

50 C.F.R. § 17.81(a) (2022) ................................................................................ 36

2

87 Fed. Reg. 39348 (July 1, 2022) ...................................................................... 13

3

88 Fed. Reg. 42642 (July 3, 2023) ...................................................................... 36

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

This case challenges the most recent of the United States Fish and Wildlife Service's ("FWS") misguided attempts to promulgate a management rule that provides for the conservation of endangered Mexican wolves, as required under the Endangered Species Act ("ESA"). Failing to heed the lessons of its prior failed efforts, FWS's new rule keeps the Mexican wolf population small, isolated, genetically imperiled, and constrained to an inadequate geography in Arizona and New Mexico—just as its prior, politically negotiated rule did. This District rejected FWS's prior rule, finding that it failed to protect the Mexican wolf from dire genetic threats and did not put the species on a path to recovery as required by the ESA. This Court should do the same here.

The Mexican wolf has been pulled back from the brink of extinction, but its long-term recovery is uncertain, due in large part to high levels of inbreeding. Any two wild Mexican wolves are, on average, nearly as genetically similar to each other as non-inbred siblings, posing a host of health and reproductive risks. Time is of the essence to address that genetic threat by aggressively incorporating new genes from captive-raised Mexican wolves into the wild and by establishing a set of interconnected wild populations that can foster ongoing gene flow to stave off genetic loss.

FWS's new management rule, however, does not put the wild population on a path to recovery. It is based on a flawed modeling study that underestimates the species' extinction risk and future genetic loss, resulting in inadequate management objectives that squander the limited time FWS has to get Mexican wolf recovery right. Making matters worse, bowing to political pressure, FWS did not even consider expanding the geographic scope of the Mexican wolf recovery area in the United States to allow for the creation of interconnected wild populations. Instead, FWS's vision for Mexican wolf conservation provides only for a single, isolated U.S. population together with a tiny, struggling wild population in Mexico, with no natural connection between the two. By enacting this flawed rule and failing to properly consider its impacts and alternatives, FWS violated the ESA and the National Environmental Policy Act ("NEPA").

1

1

**BACKGROUND**

2

**I.    The Endangered Mexican Wolf**

3

The Mexican gray wolf ("Mexican wolf") "is the rarest, southern-most occurring,

4

and most genetically distinct subspecies of all the North American gray wolves."

5

Statement of Facts ("SOF") ¶¶1-2 (*see* photo). Mexican wolves historically inhabited the

6

southwestern United States and Mexico. SOF ¶3. At the northern limits of their historic

7

range, Mexican wolves mixed with other gray wolf subspecies in the southern Rocky

8

Mountains and Grand Canyon regions of present-day northern Arizona and New Mexico

9

and southern Utah and Colorado. SOF ¶4.



Once numbering in the thousands, the Mexican wolf population declined rapidly

in the early and mid-1900s due to a federal, state, and private campaign to kill wolves.

SOF ¶5. These efforts eradicated the species from the United States by the early 1970s,

leaving only a small population in Mexico. *Id.* FWS listed the Mexican wolf as

endangered under the ESA in 1976. SOF ¶6.

2

By 1980, Mexican wolves were extirpated in Mexico as well. SOF ¶7. However, between 1977 and 1980, the United States and Mexico initiated a program to capture the last known wild Mexican wolves in Mexico and establish a captive breeding program to prevent the subspecies' utter extinction. SOF ¶¶8-9. Just seven wolves from that captive breeding program constitute the founding genetic stock for every Mexican wolf alive today. SOF ¶10.

**II.    The Mexican Wolf Reintroduction Program**

FWS in 1982 issued a document styled as a "recovery plan" for the Mexican wolf, but admitted it was an incomplete stopgap that failed to establish any benchmark for full recovery. SOF ¶¶11-12. To implement that stopgap measure, FWS in 1998 released 11 captive-reared Mexican wolves into the wild into what was then called the "Blue Range Wolf Recovery Area" straddling the Arizona-New Mexico border. SOF ¶13. FWS conducted the release pursuant to ESA section 10(j)'s experimental population provision, which authorizes modification of the Act's otherwise applicable prohibitions to facilitate such reintroductions. SOF ¶14; *see generally* 16 U.S.C. § 1539(j). At the same time, FWS promulgated a rule to guide management of the reintroduced section 10(j) population. SOF ¶16.

While the reintroduction program has been beset with numerous problems, the wild population has grown in recent years. At the end of 2021, a minimum of 196 wild wolves inhabited what is now called the Mexican Wolf Experimental Population Area ("MWEPA"), encompassing the states of Arizona and New Mexico south of Interstate 40 ("I-40"). SOF ¶18. In addition, as of 2022, 45 Mexican wolves inhabited a portion of the Sierra Madre Occidental in northern Mexico as of 2022 as a result of that country's reintroduction program, initiated in 2011. SOF ¶19.

**III.    Unresolved Threats to the Mexican Wolf**

The reintroduction restored Mexican wolves to the wild, but the reintroduced population faces numerous unresolved threats that leave the future of Mexican wolf recovery in jeopardy.

3

### A.    Genetic Problems

Severe levels of inbreeding, resulting in a lack of gene diversity, pose a primary threat to Mexican wolf recovery. The genetic challenges to Mexican wolf recovery originate from the small number of individuals that remained in existence when conservation efforts for this subspecies began, resulting in a "severe genetic bottleneck." SOF ¶20. Unfortunately, despite efforts by captive breeding facilities to preserve as much genetic diversity as possible, much of the genetic potential of the founding stock has been lost. As of 2021, the captive population retained just 82.49% of the gene diversity of its founders. SOF ¶21. This level "is lower than the recommended retention of 90% for most captive breeding programs." SOF ¶22. FWS acknowledges that the captive population's "genetically depauperate" state has always been a concern for recovery. SOF ¶23.

The wild population is in even worse genetic shape. As of 2021, the "founder genome equivalent" of the U.S. wild population was only 2.1. SOF ¶25. This means that, although all wild Mexican wolves descend from seven individuals, this population retains the genetic material of only approximately two individual founders. SOF ¶26. This level of founder genome equivalents is lower than that of all but possibly one other reintroduced endangered species in North America. SOF ¶27. Other measures confirm the wild Mexican wolves' genetic plight: as of 2021, U.S. wild population wolves remained, on average, nearly as related to one another as full siblings, and retained just 76.23% of the founders' gene diversity. SOF ¶24, 28-29.

The adverse effects of inbreeding, known as inbreeding depression, pose a significant threat to population viability. Studies on both wild and captive Mexican wolves have demonstrated that inbreeding significantly impairs reproduction. SOF ¶¶30-33. Inbreeding can also increase deformities and decrease disease resistance. SOF ¶¶34-35. And, as FWS has acknowledged, the decreased genetic diversity resulting from inbreeding "will limit the ability of future Mexican wolf populations to adapt to environmental challenges." SOF ¶36. Thus, inbreeding causes a range of short and long-term effects, which FWS acknowledges "can be difficult to detect." SOF ¶37. Moreover,

it is "hard to reverse adverse genetic conditions once they are recognized." *Id*. For example, an isolated, inbred gray wolf population on Isle Royale, Michigan, survived for decades before dwindling to just two animals due to inbreeding. SOF ¶38.

Since 2009, FWS has implemented a supplemental/diversionary feeding program that mitigates—and conceals the extent of—inbreeding impacts on the wild population. Through this program, FWS provides food caches to approximately 70% of wild Mexican wolves to boost survival with extra nutrition ("supplemental") and to divert wolves from livestock and thus reduce the risk of conflicts ("diversionary"). SOF ¶¶39-41. There is evidence that supplemental/diversionary feeding increases pup production, which helps to offset, and thus may mask, the reproductive impacts otherwise threatened by inbreeding that will become apparent if supplemental feeding is stopped or reduced. SOF ¶¶42, 147. The feeding program also obscures the threat posed by livestock operations in wolf habitat, as unfed wolves would likely become involved in more livestock conflicts and face killing or live-removal to remedy such conflicts. SOF ¶¶43-46.

Significant genetic rehabilitation is urgently needed for Mexican wolf recovery. Because the captive population is more genetically diverse than the wild population, the main way FWS tries to increase genetic diversity in the wild population is by releasing genetically valuable captive wolves. SOF ¶47. But, as FWS recognizes, "releases from captivity can improve gene diversity more quickly when the recipient population is smaller." SOF ¶48. Thus, genetic diversity must be improved "in the near term" because "it will be more difficult to improve gene diversity and alleviate genetic threats at larger population sizes." SOF ¶49.

### B.    Excessive Killings and Removals

The genetic impediments to recovery are exacerbated by extremely high levels of Mexican wolf killing and removal from the wild. Since the inception of the reintroduction program, illegal killing has been the largest source of mortality. SOF ¶50.  However, FWS has supplemented the impact of that unlawful mortality by authorizing and/or

carrying out its own removals of Mexican wolves via killing or capture. SOF ¶51. Although the ESA would normally forbid such removals of an endangered species, the designation of Mexican wolves as a "nonessential" experimental population allows the FWS a broader range of management measures, including "limited 'take' of individual Mexican wolves." SOF ¶52. FWS authorized and/or carried out the removals of 206 Mexican wolves from the reintroduced population between 1998 and 2019, including genetically valuable individuals that could have improved the U.S. wild population's genetic diversity had they not been removed. SOF ¶¶53-54.

### C.    Arbitrary Geographic Limits

 Since reintroduction began, FWS has constrained the wild population to an ecologically arbitrary geography—south of I-40 in Arizona and New Mexico—that impedes the species' recovery. SOF ¶¶55-57. When wolves attempt to establish territories outside this ecologically arbitrary boundary, FWS captures and relocates them. SOF ¶58.

If they are not allowed to disperse north of I-40, it is highly unlikely that Mexican wolves will achieve long-term, self-sustaining recovery. Leading experts assigned by FWS to a Mexican wolf recovery team advised in 2012 that recovery of the species would require at least three separate, but connected, populations of Mexican wolves in the wild, totaling at least 750 wolves—a "metapopulation." SOF ¶¶59-60. Well-connected metapopulations are generally better able to withstand less favorable demographic rates (e.g., birth rate, fertility rate, life expectancy) and catastrophic environmental events (e.g., wildfire, disease outbreak) than isolated populations. SOF ¶¶61-65. This is because (1) connectivity facilitates gene flow as individuals move between populations, reducing the severity and effects of inbreeding, and (2) multiple populations help to ensure that the species is not wiped out if a catastrophic event decimates one of the populations. *Id.* A well-connected metapopulation is especially important for the recovery of the Mexican wolf, which today exists in the wild in the U.S. as one small, isolated, and genetically threatened population, with no meaningful natural connectivity to an even smaller reintroduced population in Mexico. SOF ¶66.

FWS has recognized, based on a peer-reviewed habitat-suitability assessment, that the southwestern United States has three large areas of suitable Mexican wolf habitat. SOF ¶67. These three areas, each of which contains a large, core area of undeveloped public lands subject to conservation mandates and could support populations of several hundred wolves each, are in eastern Arizona and western New Mexico (i.e., the location of the current wild population), northern Arizona and southern Utah (Grand Canyon), and northern New Mexico and southern Colorado (Southern Rockies). SOF ¶68. Nevertheless, FWS's management has prevented Mexican wolves from establishing new populations in the Grand Canyon and Southern Rockies areas, which lie north of I-40. SOF ¶¶69-71.

## IV.    The Invalidated 2015 10(j) Rule

When FWS undertook to promulgate a new 10(j) management rule for the Mexican wolf population in 2015—after being spurred by litigation to improve the failing reintroduction program, SOF ¶72—it did not resolve these problems, but rather perpetuated or even compounded them. During that rulemaking, FWS entered into discussions with officials from the Arizona Game and Fish Department ("AZGFD") regarding the terms of the rule. SOF ¶73. Correspondence in the record indicates that AZGFD demanded that FWS establish a cap for the Mexican wolf population and allow for removal of wolves that negatively impact wild deer and elk populations based on AZGFD's determination. SOF ¶¶74-75.

Despite initially resisting some of AZGFD's terms, FWS ultimately capitulated to them. SOF ¶¶78-79. Among other things, the 2015 10(j) Rule provided that FWS would: cap the population of Mexican wolves at 300-325 individuals; seek to integrate only one to two "effective migrants" per generation from the captive population to the wild population;[1] authorize more permits for the otherwise prohibited "taking" (including

---

[1] "Effective migrants," as used in the 2015 10(j) Rule, referred to released wolves that successfully reproduce in the wild.

1  killing) of Mexican gray wolves;[2] and authorize the taking of Mexican wolves if FWS

2  concurred with a determination by the states of Arizona or New Mexico that wolves were

3  having an "unacceptable impact" on wild ungulate herds. SOF ¶80. None of the 2015

4  10(j) Rule's expanded taking authorizations included any safeguards to prevent removal

5  of genetically valuable wolves needed to rehabilitate the wild population's depleted

6  genetic integrity. SOF ¶81.

7       Further, although the 2015 10(j) Rule expanded the wild population's range from

8  the original region established for the 1998 reintroduction to encompass a broader

9  MWEPA, it still imposed an ecologically arbitrary northern boundary of I-40 in Arizona

10 and New Mexico. SOF ¶82. This boundary cut off wolf access to the Grand Canyon and

11 Southern Rockies regions that wolf-recovery experts had identified as essential for

12 establishing the Mexican wolf metapopulation needed for recovery. Indeed, in its

13 Environmental Impact Statement ("EIS") for the 2015 10(j) Rule, FWS acknowledged

14 that "an expansion of the MWEPA north of I-40 into southern Colorado and Utah with

15 provisions to allow wolves to disperse into and occupy the expanded area would provide

16 a large area of suitable habitat for the Mexican wolf and increased flexibility to the

17 Reintroduction Project." SOF ¶70.  Arizona, New Mexico, Colorado, and Utah, however,

18 opposed allowing wolf dispersal north of I-40, and FWS noted internally that it would not

19 consider northward MWEPA expansion without "absolute state concurrence." SOF ¶¶76-

20 77. Ultimately, FWS maintained the I-40 boundary.

21      After numerous parties, including most of the Plaintiffs in the present cases,

22 challenged the 2015 10(j) rule, this District ruled in 2018 that the 2015 10(j) Rule "as a

23 whole fails to further recovery" of the Mexican wolf and therefore violates the ESA. *Ctr.*

24 *for Biological Diversity v. Jewell*, No. 15-cv-19, 2018 WL 1586651, at *17 (D. Ariz.

25

26 [2] The 2015 10(j) Rule authorized FWS to issue permits to livestock and other domestic animal owners (a) on non-federal lands, to kill Mexican wolves in connection with a

27 federal wolf-removal action (but not confined to killing wolves known to have killed livestock); and (b) on federal (or non-federal) lands, to kill wolves in the act of wounding

28 livestock and to allow livestock guard dogs to kill wolves.

Mar. 31, 2018) (the "2018 Remand Order"). This was because "the 2015 rule only provides for the survival of the species in the short term and therefore does not further recovery for the purposes of Section 10(j)," and, "by failing to provide for the population's genetic health, FWS has actively imperiled the long-term viability of the species in the wild." *Id.* at *13.

The court deemed unlawful the 2015 10(j) Rule's provisions for a "single, isolated population of 300-325 wolves" with only one to two effective migrants per generation. *Id.* at *14. The court criticized FWS for "misinterpret[ing]" the findings of several scientific studies "which it had relied upon" to support its population and effective migration provisions, explaining that the 2015 rule's "population size and effective migration rate … fails to account for the fact that the Blue Range population is not connected to a metapopulation and suffers from a higher degree of interrelatedness than is assumed in those studies." *Id.* The court also held that the "expanded take provisions" of the 2015 10(j) Rule "[did] not contain adequate protection for the loss of genetically valuable wolves." *Id.* at *15. The court pointed out that "FWS [had] repeatedly recognized that one of the chief threats to the species is loss of genetic diversity, … yet the expanded take provisions lack protections for loss of genetic diversity." *Id.* In addition, the court criticized FWS for imposing "a hard limit on dispersal north of I-40" despite the agency's own acknowledgement that "territory north of I-40 will likely be required for future recovery" and that "natural dispersal" was important for recovery. *Id.* at *14 n.13. Finally, the court determined that FWS could not continue to rely on its 1998 determination that the experimental population was "nonessential," but must instead make a new essentiality determination. *Id.* at *19. The court remanded the 2015 10(j) Rule to FWS to correct these errors but allowed the Rule to remain in effect during the remand period. *Id.* at *23.

## V.    The 2017 Recovery Plan

While litigation over the 2015 10(j) Rule was ongoing, FWS developed a Mexican Wolf Recovery Plan (the "2017 Recovery Plan") to replace the 1982 stopgap plan. This

9

1    was not the first such effort. FWS had disbanded multiple prior efforts. SOF ¶94. Most

2    recently, a 2010 recovery team that included some of the world's foremost wolf

3    biologists had produced a 2012 draft recovery plan that called for a metapopulation of

4    750 wolves comprising three, separate but interconnected core populations of 200 to 300

5    each, located in the Blue Range, Grand Canyon, and Southern Rockies regions. SOF ¶95.

6    However, FWS suspended the recovery team's work—concededly "due to politics"—

7    before the plan could be completed. SOF ¶96.

8        In late 2015, FWS initiated a new recovery planning process designed to

9    "provide[] a 'no surprises' approach for the states of Arizona, New Mexico, Colorado,

10    and Utah" and to prioritize state input. SOF ¶97. Although a few scientists from the prior

11    recovery team participated in recovery planning workshops together with FWS and state

12    game department representatives, only the state and federal representatives were invited

13    to attend certain sessions during the workshops, to review and comment on the text of the

14    Recovery Plan before FWS publicly proposed it, and to review and opine on any changes

15    before FWS issued the final plan. SOF ¶98. Throughout the process, representatives of

16    "[a]ll four states noted their opposition to [Mexican wolf] recovery north of Interstate

17    40." SOF ¶99. AZGFD representatives also argued against using a direct genetic

18    metric—such as gene diversity or founder genome equivalents—as a criterion for

19    assessing whether the species had sufficiently recovered to be delisted, contending that

20    such a measure would "likely obstruct the delisting" of Mexican wolves and was "based

21    on exaggerated concerns about inbreeding depression in the wild." SOF ¶100. And as

22    they had for the 2015 10(j) Rule, FWS decisionmakers internally emphasized the

23    importance of state buy-in. SOF ¶101.

24        Unsurprisingly, the resulting recovery plan reflected the states' priorities, at the

25    expense of wolf recovery, and represented only a minor departure from the approach

26    FWS took in the 2015 10(j) Rule. It maintained the northern I-40 boundary, set a

27    population target within the range of the previously negotiated population "cap," and

28    failed to address the dire genetic threat by including only an inadequate proxy measure

10

1   for genetic recovery, rather than requiring actual, measurable improvements in genetic

2   diversity. Specifically, the 2017 Recovery Plan provided that the Mexican wolf would be

3   fully recovered and ready to be removed from the endangered species list if two

4   populations—one in the United States (south of I-40) and one in Mexico—met the

5   following "delisting" criteria: (1) the U.S. population averages at least 320 wolves and

6   the Mexico population averages at least 200 wolves over eight years, and each is stable or

7   increasing; (2) the captive breeding program releases a sufficient number of captive

8   wolves into the wild to result in at least 22 released wolves surviving to "breeding age" in

9   the U.S. and 37 doing so in Mexico—regardless of whether they actually breed; and

10  (3) adequate state, Tribal, and Mexican regulations are in place to limit human-caused

11  mortality. SOF ¶102.

12          To justify these criteria, FWS relied primarily on a modeling report called a

13  population viability analysis that its consultant, Dr. Philip Miller, performed in

14  collaboration with FWS and with input from the participants in the recovery planning

15  workshops (the "Miller PVA"). SOF ¶103. The Miller PVA, referred to in FWS

16  documents as "Miller (2017)," used a computer program called *Vortex* to simulate future

17  Mexican wolf population dynamics in the MWEPA and in Mexico based on a set of

18  assumptions. SOF ¶128. As discussed in Argument Point III.B. and C., those assumptions

19  incorporated a high degree of uncertainty, omitted key factors, and were unrealistically

20  optimistic, and FWS misapplied the study in setting the delisting criteria.

21          In support of its choice to rely on Mexico for the second Mexican wolf population

22  needed for long-term recovery—instead of one of the previously identified suitable U.S.

23  areas north of I-40—FWS relied on a habitat-suitability assessment referred to as

24  "Martinez-Meyer (2017)." SOF ¶104. As discussed in Argument Point III.E, that

25  assessment excluded areas north of I-40, concededly lacked reliable prey-density data (a

26  key factor in wolf survival), and did not consider other key factors, including livestock

27  prevalence and private vs. public landownership.

28

1    After several parties, including most of the Plaintiffs in the present cases,

2    challenged the 2017 Recovery Plan in this District, the court found that the 2017

3    Recovery Plan lacked necessary site-specific management actions addressing human-

4    caused mortality, but dismissed as unreviewable plaintiffs' claims challenging the

5    substantive adequacy of the plan, including its delisting criteria and its I-40 boundary,

6    holding that the recovery plan was not a "final agency action." *Ctr. for Biological*

7    *Diversity v. Zinke*, 399 F. Supp. 3d 940, 944-46, 949-950 (D. Ariz. 2019); *Ctr. for*

8    *Biological Diversity v. Haaland*, 562 F. Supp. 3d 68, 80 (D. Ariz. 2021). The Ninth

9    Circuit dismissed plaintiffs' appeal as moot after FWS issued a revised recovery plan in

10   response to the court's order. *WildEarth Guardians v. Haaland*, No. 22-15029, 2023 WL

11   8613628, at *1 (9th Cir. Dec. 13, 2023).

12   **VI.    The 2022 Revised 10(j) Rule**

13   While the Recovery Plan litigation proceeded, FWS in October 2021 responded to

14   the 2018 Remand Order by releasing a proposed revision of its 2015 10(j) Rule. SOF

15   ¶106. Essentially cutting and pasting from the 2017 Recovery Plan, the agency proposed

16   to manage for a single, isolated U.S. population in Arizona and New Mexico with (a) at

17   least 320 wolves, averaged over eight years (the "population objective"); and (b) a

18   sufficient number of captive wolf releases into the wild population to result in at least 22

19   released wolves surviving to breeding age, regardless of whether any actually breed (the

20   "genetic objective"). SOF ¶107. The agency expected to meet the genetic objective by

21   2030. *Id.* Regarding the previously invalidated provisions for permitting the taking of

22   Mexican wolves, FWS now proposed to make them contingent on the new genetic

23   objective—i.e., FWS would issue no take permits for unacceptable impacts to a wild

24   ungulate herd until the genetic objective was met, and issue no permits under the

25   expanded provisions for take on federal and non-federal land unless annual benchmarks

26   of progress toward the genetic objective were met or takings the previous year did not

27   include the killing of any released wolf that would have counted toward the genetic

28   objective. SOF ¶108. Finally, the proposed Revised 10(j) Rule maintained the I-40

1   MWEPA boundary and reasserted FWS's commitment to "capture and return" or place in

2   captivity any Mexican wolves that leave the MWEPA. SOF ¶109. Thus, the proposed

3   Revised Rule incorporated only minor changes from the 2015 10(j) Rule.

4          FWS drew the substance of the proposed Revised 10(j) Rule from the 2017

5   Recovery Plan even though peer reviewers and other wolf recovery experts had identified

6   significant flaws in the plan and the studies—the Miller PVA and Martinez-Meyer

7   (2017)—underlying it. *See* Argument Point III. For example, experts questioned the logic

8   of measuring genetic recovery based on a surrogate metric—the number of released

9   wolves surviving to breeding age—drawn from a highly uncertain model, instead of

10  simply using one of the already monitored direct measures of the population's genetic

11  diversity. *See* Argument Point III.C. They also pointed out that many of the assumptions

12  underlying the Miller PVA were unrealistically optimistic, that FWS disregarded the

13  PVA's uncertainty in setting the delisting criteria, that meeting the delisting criteria

14  would still result in genetic decline (even if the PVA's assumptions held up), and that

15  Martinez-Meyer (2017) was unreliable because it ignored key factors such as

16  landownership and livestock prevalence and lacked meaningful prey data for Mexico. *See*

17  Argument Point III.B, E.

18         Although commenters on the proposed rule reiterated these critiques, SOF

19  ¶¶120-22, FWS's Final Supplemental EIS for the Revised 10(j) Rule ("FSEIS") did not

20  seriously engage with them, nor did it explore alternative management approaches that

21  might address them. Instead, the FSEIS considered just three alternatives: (1) the

22  proposed Revised 10(j) Rule; (2) a variation from FWS's proposed Revised 10(j) Rule

23  that retained the 2015 10(j) Rule's unlawful taking provisions; and (3) the unlawful 2015

24  10(j) Rule. SOF ¶123. FWS considered no alternatives to its proposal that could lawfully

25  be implemented consistent with the 2018 Remand Order.

26         On July 1, 2022, FWS issued the final rule (the "Revised 10(j) Rule"). Revision to

27  the Nonessential Experimental Population of the Mexican Wolf, 87 Fed. Reg. 39348

28  (July 1, 2022). The final rule retained all the key features of the proposed rule: the

1    population and genetic objectives, the expanded take provisions conditioned on the

2

3    genetic objective, and the I-40 boundary (enforced through capture of wolves who roam

beyond it). SOF ¶127.

4                           **ARGUMENT**

5         FWS has again promulgated a Mexican wolf management rule that fails to "further

6    recovery for the purposes of Section 10(j)." *Ctr. for Biological Diversity*, 2018 WL

7    1586651, at *13. FWS's Revised 10(j) Rule results from an agency decision-making

8    process that made irrational assumptions, disregarded critical factors, and ignored readily

9    available and more justifiable alternative approaches. Accordingly, FWS violated the

10    ESA and NEPA.

11    **I.**      **Standard of Review**

12         "Summary judgment is a particularly appropriate tool for resolving claims

13    challenging agency action." *Id.* at *2 (cleaned up[3]). "Judicial review of agency decisions

14    under NEPA … and the ESA is governed by the Administrative Procedure Act ('APA'),

15    which specifies that an agency action may be overturned only where it is found to be

16    'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"

17    *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (quoting 5

18    U.S.C. § 706(2)(A)). An agency action is arbitrary and capricious "if the agency has

19    relied on factors which Congress has not intended it to consider, entirely failed to

20    consider an important aspect of the problem, offered an explanation for its decision that

21    runs counter to the evidence before the agency, or is so implausible that it could not be

22    ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*

23    *Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").

24    **II.**      **Plaintiffs Have Standing**

25         The declarations submitted with this motion establish that Plaintiffs' members

26    have suffered concrete and particularized injuries to their aesthetic, recreational, and

27

28

---

[3] This brief uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations.

conservation interests that are fairly traceable to the defendants' challenged action and likely to be redressed by a favorable decision. *See* Declarations of Grant Gourley, Craig Miller, Jean Ossorio, Peter Ossorio, Michael Robinson, William Wood, and Tom Zieber. These interests are germane to Plaintiffs' organizational purposes and Plaintiffs' claims do not require the participation of individual organizational members. *See* Robinson Decl. ¶3; Miller Decl. ¶¶2-5. Accordingly, Plaintiffs have standing.

**III.    FWS Violated the ESA**

FWS violated the ESA's mandate to promulgate a 10(j) Rule that provides for the long-term recovery of the Mexican wolf by arbitrarily: (1) basing the population and genetic objectives on its misapplication of the flawed Miller PVA; (2) using an unreliable proxy for the genetic objective; (3) conditioning the taking provisions on the inadequate genetic objective; and (4) retaining the I-40 MWEPA boundary and failing to consider its impact on recovery.

**A.    The ESA's Recovery Mandate**

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). While the ESA affords endangered species such as the Mexican wolf critical protections against actions that might doom them to extinction, "the ESA was enacted not merely to forestall the extinction of species (i.e., promote a species survival), but to allow a species to recover to the point where it may be delisted." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004), *amended on other grounds,* 387 F.3d 968 (9th. Cir. 2004). Indeed, Congress enacted the ESA "to provide a program for the conservation of … endangered species."16 U.S.C. § 1531(b). And the ESA establishes a congressional policy that "all Federal departments and agencies shall seek to conserve endangered species … and shall utilize their authorities in furtherance of the purposes of" the ESA. *Id*. § 1531(c)(1). "Conservation" and "conserve," under the ESA, mean "to use and the use of all methods and procedures which are necessary to bring any endangered species … to the point at which the measures provided pursuant to

1    [the ESA] are no longer necessary"— i.e., to recover such species from imperilment. *Id.*

2    § 1532(3). Thus, the ESA's ultimate goal is "to promote populations that are self-

3    sustaining without human interference." *Trout Unlimited v. Lohn*, 559 F.3d 946, 957 (9th

4    Cir. 2009).

5         This overriding conservation—i.e., recovery—mandate is "at the heart of" the

6    ESA's section 10(j) provisions for species reintroductions. *Ctr. for Biological Diversity*,

7    2018 WL 1586651, at *5. FWS reintroduced the Mexican wolf as an experimental

8    population under section 10(j), which authorizes such reintroductions if they "will *further*

9    *the conservation* of [the] species." 16 U.S.C. § 1539(j)(2)(A) (emphasis added). Each

10   member of an experimental population generally "shall be treated as a threatened

11   species," *id.* § 1539(j)(2)(C), which makes them subject to "such regulations as [FWS]

12   deems necessary and advisable to *provide for the conservation* of such species," *id.* §

13   1533(d) (emphasis added). Thus, any regulations issued to manage experimental

14   populations under section 10(j)—including the Revised 10(j) Rule—must "provide for

15   the conservation" (i.e. recovery) of the species. *See Sierra Club v. Clark*, 755 F.2d 608,

16   612–13 (8th Cir. 1985) ("The extent of [FWS's] discretion" under § 1533(d) "is limited

17   by the requirement that the regulations [the agency] is to issue must provide for the

18   *conservation* of threatened species.").

19   **B.    The Revised 10(j) Rule's Population and Genetic Objectives**
          **Arbitrarily Reflect FWS's Misapplication of the Flawed Miller PVA.**
20
          The Revised 10(j) Rule's population and genetic objectives are irrational and fail
21
     to provide for species recovery because they are based exclusively on FWS's
22
     misapplication of a flawed modeling effort: the 2017 Miller PVA. FWS ignored the
23
     objections of experts who pointed out that the Miller PVA incorporated overly optimistic
24
     assumptions which led it to underestimate extinction risk and genetic loss. Moreover,
25
     even if the Miller PVA had produced reliable estimates of extinction risk and genetic
26
     loss, FWS misused it to set population and genetic objectives at an insufficiently
27
     protective level—seeking to retain just 90% of the genetic diversity that the captive
28

population retains after 100 years of genetic deterioration. Finally, FWS misapplied the Miller PVA to set management objectives at the bare minimum that the Miller PVA predicted would be needed to meet FWS's under-protective genetic aims, ignoring the Miller PVA author's own warnings against such use.

While an agency's reliance on modeling is reviewed deferentially, "if the model is challenged, the agency must provide a full analytical defense." *Nat'l Parks Conservation Ass'n v. E.P.A.*, 788 F.3d 1134, 1146 (9th Cir. 2015) (cleaned up). The model must bear a "rational relationship to the characteristics of the data to which it is applied." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 621 (9th Cir. 2014). And the agency has a responsibility to "examine key assumptions as part of its affirmative burden of promulgating and explaining a non-arbitrary, noncapricious rule." *Columbia Falls Aluminum Co. v. E.P.A.*, 139 F.3d 914, 923 (D.C. Cir. 1998). Moreover, as with any scientific methodology, the agency must "provide[ ] a reasonable explanation for adopting its approach and disclose[ ] the limitations of that approach," and, where there are conflicting studies or data, must "provide a reason to credit" those it relied on. *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1068–69 (9th Cir. 2018). FWS's use of the Miller PVA in the Revised 10(j) Rule failed all these tests.

1.    FWS Arbitrarily Relied on a Model that Incorporated Irrational Assumptions and Underestimated Extinction Risk and Genetic Loss.

The Miller PVA model is based on a series of overly optimistic assumptions that caused it to underestimate the wild Mexican wolf population's probability of extinction and the extent of its genetic imperilment. As noted above, the Miller PVA used the *Vortex* model to simulate future wild Mexican wolf population dynamics in the MWEPA and in Mexico. After starting with a baseline of pedigree information for the existing populations, the *Vortex* program simulated an annual series of life-cycle events (e.g. reproduction and death) and management actions (e.g. removals, translocations, and captive releases) to project what could happen to those populations in subsequent years. SOF ¶129. The likelihood of those events occurring in the model was determined by its

17

assumptions for things like mortality rates, birth rates, and litter size, and for a variety of factors that would be expected to affect those rates, such as female pairing rates, inbreeding effects, and supplemental feeding. SOF ¶130.  Based on these assumptions, the PVA generated estimates of each population's likelihood of extinction and level of genetic diversity after 100 years. SOF ¶131.

As with any such modeled outputs, their reliability depends on the assumptions they incorporate. Here, as experts pointed out, numerous key assumptions were irrationally optimistic, leading the model to underestimate extinction risk and genetic loss. Nevertheless, without rationally explaining its choice to ignore the model's flaws and experts' critiques, FWS relied exclusively on the model to set the conservation parameters for its Revised 10(j) Rule, thereby violating ESA section 10(j)'s overriding species-recovery objective. *See Ctr. for Biological Diversity*, 2018 WL 1586651, at *5.

At the outset, the Miller PVA model made a series of unfounded assumptions about the impact and implementation of the supplemental/diversionary feeding program by which FWS provides food caches for approximately 70% of wild wolves to increase survival and reduce conflicts. First, the Miller PVA underestimated the adverse impacts of phasing out this program. The Miller PVA's primary analyses all incorporated the assumption that feeding rates would gradually decline from 70% of packs being fed to 15%, and then remain at 15% for the remainder of the 100-year simulation. SOF ¶132. Because the purpose of supplemental/diversionary feeding is to boost survival with added nutrition and to decrease livestock depredation and resulting wolf killing or removal, participants in the recovery planning workshops—including FWS biologists—agreed that the model should incorporate higher mortality/removal rates[4] for unfed wolves than fed wolves. SOF ¶133. Had this rational assumption been implemented in the modeling, more wolves would have been assumed to have higher mortality rates as the proportion of

---

[4] In the PVA model, "mortality" included removals, whether lethal or not, because the effect on the wild population was the same. SOF ¶133.

1   non-fed wolves increased over time, thereby decreasing the modeled population size and

2   presenting additional challenges for achieving recovery objectives. Indeed, Miller

3   reported "fairly dramatic results" when incorporating differential fed vs. non-fed

4   mortality rates into test runs of the model. SOF ¶134.

5       But the Miller PVA did not end up incorporating this expected effect of reduced

6   feeding into the model; it simply omitted it, using the same removal/mortality rate for

7   both fed and unfed wolves. SOF ¶135. Indeed, the PVA report admitted that this

8   omission may have skewed the results, stating: "additional consequences of diversionary

9   feeding …, such as individual wolf removal rates, may not be fully understood and, as a

10  result, may not be incorporated into the model with the intended accuracy." SOF ¶136.

11  For this reason alone, the model "failed to consider" a key factor—the impact of

12  supplemental/diversionary feeding on wolf-removal/mortality rates—that substantially

13  impacts conservation and would have significantly altered the model's results, rendering

14  FWS's reliance on the model arbitrary. *State Farm*, 463 U.S. at 43; *see Greater*

15  *Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1028 (9th Cir. 2011) ("It is not

16  enough for [FWS] to simply invoke 'scientific uncertainty' to justify its action. … [FWS]

17  must rationally explain why the uncertainty … counsels in favor of" its decision.).

18      Further, the PVA improperly assumed that at least 15% of wolves would be fed

19  for the entire 100-year simulation. The model incorporated an assumption that

20  supplemental feeding boosts litter size, so the assumption of perpetual feeding allowed

21  this enhanced level of reproduction for 15% of wolves to continue for 100 years. SOF

22  ¶137. But that assumption of perpetual feeding is inconsistent with the ESA's recovery

23  goal of creating "populations that are *self-sustaining without human interference*." *Trout*

24  *Unlimited*, 559 F.3d at 957 (emphasis added).

25      After experts reviewing the draft PVA pointed this out, the Miller PVA modeled a

26  scenario in which supplemental feeding was gradually phased out entirely. SOF ¶¶138-39

27  Yet in that scenario, the modeled wild populations showed long-term declining

28  abundance and their genetic diversity failed to meet FWS's stated recovery goals. SOF

¶140. To rectify this problem, Miller, in consultation with FWS, irrationally altered the model, reducing the model's adult mortality rate assumption from 24.9% to 20.9%, thereby enabling modeled achievement of recovery goals. SOF ¶141. But neither Miller nor FWS explained why this lower mortality rate was reasonable, especially in the absence of a critical tool—supplementary/diversionary feeding—intended to reduce wolf mortality. SOF ¶142. Indeed, the wild population's mortality/removal rates in 2007 and 2008—just before FWS expanded its use of supplemental feeding in 2009—were, respectively, 47% and 40%. SOF ¶45. [5] And as noted in the paragraph above, participants in FWS's recovery planning workshops agreed that mortality/removal would be higher in the absence of diversionary feeding, which FWS has described as "an alternative approach to heavy removal of adult wolves in response to livestock depredations." SOF ¶44. But, to make the numbers work if feeding were phased out entirely, Miller incorporated the exact *opposite* assumption into the model by *reducing* the assumed adult mortality rate. For this reason, too, the Miller PVA's assumptions about the impacts of supplemental feeding were irrational and unlawful. *See San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 621 (model must bear rational relationship to real-world data); *Ctr. for Biological Diversity v. Zinke*, 900 F.3d at 1068–69 (agency must provide reasonable explanation for methodology).

The Miller PVA incorporated irrationally optimistic assumptions not only about feeding and mortality but also regarding reproduction. To start, it improperly discounted the adverse impact of the wild Mexican wolf population's high levels of inbreeding on reproduction. A 2007 peer-reviewed study demonstrated that inbreeding levels of Mexican wolves significantly impacted both the probability that a mated pair would

---

[5] Although these mortality/removal rates appear to include all ages, not just adults, they are nonetheless much higher than the mortality/removal rates used in the PVA for any age class (based on 2009-2015 data), confirming that mortality/removal rates were higher before supplemental/diversionary feeding was implemented. SOF ¶46.

produce a litter and the size of the resulting litter.[6] SOF ¶¶30-32. The Miller PVA,
however, did not incorporate both effects into the model. Instead, while the PVA
included some impact from inbreeding on the *likelihood of producing a litter*, it
incorporated no impact of inbreeding on *litter size*, relying on an unpublished analysis
prepared by representatives of the Arizona and New Mexico game and fish departments
to justify this assumption. SOF ¶143. But when an independent scientist participating in
the recovery planning workshops—Dr. Richard Fredrickson, the lead author of the 2007
study—analyzed the data, he found that higher inbreeding levels greatly decreased the
litter size detected at year-end pup counts in the wild population. SOF ¶144. He also
analyzed data from the captive Mexican wolf population and found that inbreeding
decreased litter size there as well. SOF ¶145. Dr. Fredrickson provided these analyses to
FWS and to the author of the Miller PVA while the PVA was being developed. SOF
¶146. Nonetheless, despite acknowledging that some inbreeding impacts "may currently
be masked" by supplemental feeding and that detection of inbreeding impacts is difficult,
the Miller PVA did not incorporate any inbreeding effects on litter size. SOF ¶147. Nor
did FWS explain its disregard of Dr. Fredrickson's findings. *See Ctr. for Biological
Diversity v. Zinke*, 900 F.3d at 1068–69 (FWS arbitrarily disregarded conflicting analysis
without explanation); *Ctr. for Biological Diversity*, 2018 WL 1586651, at *16 (same).

Additionally, the Miller PVA model incorporated an overly optimistic assumption
that 78% of adult females would pair with a mate each year, an assumption that also
served to boost modeled fecundity. SOF ¶148. FWS explained that this figure represented
the average of two methods of estimating this parameter from wild Mexican wolf data.
SOF ¶149. The first method's estimate (86%) was "likely biase[d]" high, FWS explained,
due to a sampling method that prioritized "breeding adults." SOF ¶150. As for the other

---

[6] This study separately considered the captive and wild Mexican wolf populations and
found strong inbreeding impacts on reproduction in each population. For the wild
population the only metric discussed was litter size. SOF ¶32.

method's estimate (69%), FWS noted potential biases pointing in differing directions and did not conclude it was more biased in either direction. SOF ¶151. Despite this apparent lack of parity between the estimates, FWS simply averaged the two. Experts pointed out this flaw and identified additional information showing FWS's assumption was too optimistic. SOF ¶¶152-54. In a comment letter, Dr. Carlos Carroll, a biologist and wolf PVA expert on whom FWS has frequently relied, noted that (a) a review of nine published studies of other wolf populations showed a mean female pairing rate of 68%, (b) a study of Yellowstone wolves by the National Park Service's Senior Wolf Biologist found that pairing rates declined as wolf population density increased, and (c) the PVA was very sensitive to small changes in this parameter based on Carroll's review of the model. SOF ¶153; *see Ctr. for Biological Diversity*, 2018 WL 1586651, at *10 and *10 n.8 (noting FWS's frequent reliance on Carroll's work regarding Mexican wolf recovery). A peer reviewer of the Revised 10(j) Rule raised similar concerns. SOF ¶154. Yet FWS did not revise the pairing rate assumption or rationally explain that choice. FWS therefore again arbitrarily ignored conflicting evidence and relied on an unjustified assumption that bore no "rational relationship" to actual wolf population data. *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 621; *see Ctr. for Biological Diversity v. Zinke*, 900 F.3d at 1068–69.

> 2.   FWS Irrationally Set the Genetic and Population Objectives at Levels Even the Miller PVA Predicted Would Result in Genetic Decline, Contrary to the ESA's Recovery Mandate.

While the Miller PVA's erroneous assumptions and underestimation of extinction risk and genetic loss render the Revised 10(j) Rule's genetic and population objectives irrational, FWS exacerbated the problem by choosing insufficient population and genetic objectives that even the overly optimistic Miller PVA predicted would yield *deterioration* of the Mexican wolf's genetic health. FWS set those objectives at levels that the Miller PVA predicted would result in the U.S. wild population retaining 90% of the genetic diversity that would be retained by the genetically deteriorating captive population after

100 years—not 90% of the *then-current* level of diversity in the captive population or in the wild and captive populations combined, both of which were alternative, scientifically supported targets suggested by leading scientists. SOF ¶¶155, 163-64, 166-67. According to FWS, meeting its ever-weakening standard would be sufficient "to alleviate the risks of genetic threats" to the Mexican wolf. SOF ¶156. But FWS's chosen standard defied the agency's own analysis and this District's remand direction.

In 2017, when the Miller PVA was finalized, the U.S. wild population already possessed 89.6% of the gene diversity then in the captive population. SOF ¶159. Thus, FWS's 90% target was tantamount to a goal of simply maintaining the same proportion of the captive population's genetic diversity over the next century, even though the U.S. wild population's poor genetic status remains a primary threat to the long-term survival of the species and a key impediment to its recovery. Moreover, although FWS claimed that the "genetic objective will *improve* the gene diversity of the MWEPA population sufficient to alleviate significant genetic threats," SOF ¶157 (emphasis added), FWS's genetic objective actually was projected to result in a long-term *decline* in genetic diversity of the already genetically impoverished wild population, because the captive population was predicted to lose genetic diversity over the modeled 100-year period. SOF ¶¶160-62. Dr. Carlos Carroll's comments to FWS pointed this out and illustrated a gene-diversity-improving alternative. SOF ¶162-64.

Yet FWS retained its genetic objective, even though such a target was inconsistent with FWS's own recognition in the Revised 10(j) Rule of the need for "a strong temporal focus on *improving* gene diversity," SOF ¶158 (emphasis added). Moreover, it was inconsistent with the 2018 Remand Order's holding that the 2015 10(j) Rule "fail[ed] to further recovery" because "FWS did not create a population in the 2015 rule that *would be protected against the loss* of genetic diversity," *Ctr. for Biological Diversity*, 2018 WL 1586651, at *17 (emphasis added). Instead of providing for genetic improvement and protecting against genetic loss, FWS chose objectives that charted a course for continuing genetic decline.

1    FWS's only explanation for its target of retaining 90% of the captive population's

2    ever-diminishing genetic diversity was that the target was "based on community of

3    practice in the management of captive populations." SOF ¶168. But the document FWS

4    referenced for this "community of practice"—the 2017 Population Analysis & Breeding

5    and Transfer Plan for the Mexican wolf captive breeding program—contradicts FWS's

6    contention. SOF ¶¶169-70. That plan explains: "When gene diversity falls below 90% of

7    that in the *founding population*, reproduction may be increasingly compromised by,

8    among other factors, lower birth weights, smaller litter sizes, and greater neonatal

9    mortality." SOF ¶170 (emphasis added). FWS's 90% target was measured against the

10   *captive* population's genetic diversity, which was much lower than that of the *founding*

11   population. Indeed, the captive population's gene diversity had already fallen to 83% of

12   that of the founding population by 2017. SOF ¶171. Even worse, FWS's 90% target was

13   not measured against the then-current gene diversity of the captive population, but rather

14   against the further diminished gene diversity that the captive population would retain

15   over 100 years. Nowhere did FWS articulate a "rational connection" between these facts

16   and its conclusion that managing for the continued genetic deterioration of an already

17   genetically imperiled species adequately provides for the recovery of the Mexican wolf.

18   *State Farm*, 463 U.S. at 43.

19        3.    FWS Irrationally Set the Population and Genetic Objectives at the
              Bare Minimum Levels That the Miller PVA Predicted Would
20            Achieve FWS's Inadequate Goals.

21   FWS further misapplied the Miller PVA by setting the population and genetic

22   objectives at the bare minimum levels that the Miller PVA predicted would allow the

23   U.S. wild population to achieve even the inadequate goal of retaining 90% of the captive

24   population's genetic diversity over time, incorporating no margin of safety. Reporting the

25   results of what it called a "[p]reliminary analysis … (not reported in detail here)," the

26   Miller PVA found that in modeled scenarios in which 22 released wolves were predicted

27   to survive to breeding age and mean population abundance reached approximately 320

28

24

wolves, the "gene diversity retained relative to that in the [captive population]" over 100 years was "just under 90%"—specifically, 89.7-90.1%. SOF ¶155. By setting the population and genetic objectives at levels predicted to just barely achieve FWS's 90% genetic retention target, FWS failed to account for the Miller PVA's inherent uncertainties and instead assumed that the Miller PVA's projections would pan out exactly as modeled.

In doing so, FWS ignored the PVA author's own warnings that the PVA should not be used that way. The Miller PVA warned that because of their inherent uncertainty, "PVA methodologies such as the *Vortex* system are not intended to give absolute and accurate 'answers' for what the future will bring for a given wildlife species or population." SOF ¶172. Accordingly, the Miller PVA noted, "many researchers have cautioned against the exclusive use of absolute results from a PVA in order to promote specific management actions for threatened populations." SOF ¶173. Speaking specifically about the Miller PVA itself, the author warned that "the complexity of this data analysis effort resulted in a long list of measurement uncertainties across a range of model input variables," and acknowledged that a "comprehensive examination of the impact of this range of uncertainty on population viability" might "significantly alter the strategic decisions proposed by the relevant management authorities to promote Mexican wolf recovery in the wild." SOF ¶174. Thus, any "management guidelines and targets emerging from this PVA should be viewed as guideposts that must be frequently reviewed and adjusted as new data are available." SOF ¶175.

Dr. Carroll more pointedly warned in a comment letter and in a peer reviewed study that FWS's use of the Miller PVA to identify the minimum population size and number of releases that were modeled to meet the agency's recovery goal, without incorporating any margin of error to account for uncertainty, "turns the modern concept of PVA on its head." SOF ¶¶177-78. He explained that the lack of a sensitivity analysis to evaluate the impact of parameter uncertainty renders the PVA of "limited value," and objected that it was incongruous for the PVA to rely heavily on an assumption that

1     mortality would be kept below certain levels while FWS did not implement a mortality-

2     based recovery criterion. SOF ¶¶179-80.

3          Ignoring these warnings, including the Miller PVA's own warning against

4     "exclusive use of absolute results from a PVA" to set "specific management actions,"

5     FWS relied exclusively on the absolute results of the Miller PVA to establish the

6     population and genetic objectives. SOF ¶¶ 155, 173. Moreover, FWS did so without

7     incorporating any buffer against uncertainty and without conducting the "comprehensive

8     examination" of uncertainty that Miller said might "significantly alter" management

9     decisions. SOF ¶¶155, 174, 176. Further, although the Miller PVA's predictions

10    depended on maintaining adult removal/mortality below 20.9% even after supplemental

11    feeding is ended and removal/mortality would be expected to increase, FWS did not

12    incorporate such a condition into the Revised 10(j) Rule. By failing to do so, FWS

13    omitted a key guardrail against falling short of the model's predictions. Thus, FWS failed

14    to rationally account for the Miller PVA's high level of uncertainty. *See Nat'l Wildlife*

15    *Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 905-06 (D. Or. 2016) (agency

16    violated ESA by failing to explain why it did not buffer against uncertainty when relying

17    on modeling results); *Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 879 (9th

18    Cir. 2009) (FWS arbitrarily disregarded scientist's warning about limited applicability of

19    his work).

20         The population and genetic objectives are based on irrational, overly optimistic

21    modeling assumptions, aim for genetic decline notwithstanding the species' existing

22    genetic imperilment, and fail to account for the Miller PVA's substantial uncertainty. For

23    all these reasons, the Revised 10(j) Rule arbitrarily fails to provide for Mexican wolf

24    recovery and violates the ESA.

25    **C.    The Genetic Objective Arbitrarily Uses an Unreliable Proxy in Lieu of**
26         **Actual Genetic Outcomes.**

27         Compounding the error and highlighting the irrationality of FWS's unjustified

28    reliance on the Miller PVA, the Revised 10(j) Rule's genetic objective uses an unreliable,

non-genetic proxy as the agency's goalpost for success against the species' dire genetic threat, even though direct metrics of genetic health are readily available and, indeed, already in use. The Revised 10(j) Rule's genetic objective requires only that 22 released wolves survive to breeding age—not that they actually breed and reproduce sufficiently to improve the wild population's genetic status to a point where the long-term genetic threat to Mexican wolf recovery is alleviated. Even FWS acknowledges that this is not how the success of its genetic recovery efforts ought to be measured. In the Biological Report supporting its 2017 Recovery Plan, FWS explained: "The success of cross-fostering efforts"—by which more genetically diverse captive-born pups are placed in the birthing dens of wild wolves, and which constitutes FWS's primary release strategy for the MWEPA—"is measured by pups surviving *and breeding*, such that their genetic material is integrated into the wild population" (emphasis added). SOF ¶182. FWS provided no rational explanation for the divergence between its own definition of genetic success and the measurement for genetic success that it incorporated into the Revised 10(j) Rule.

There was no practical impediment to incorporating an actual genetic diversity metric into the genetic objective. FWS currently directly monitors the genetic status of the U.S. wild population using metrics such as gene diversity, founder genome equivalents, and mean kinship, and could easily have keyed the Revised 10(j) Rule's genetic objective to any such direct measure of the population's genetic health. SOF ¶183. And, to the extent its current genetic monitoring techniques might become more difficult with population growth, FWS admitted, in response to expert comments, that "genomic survey and analysis techniques are available, may be affordable, and can be further integrated into our ongoing monitoring of the genetic status of the MWEPA [U.S. wild] population." SOF ¶184. AZGFD's representative, however, had opposed using such a direct measure of genetic improvement as a delisting criterion in the 2017 Recovery Plan (from which the Revised 10(j) Rule was drawn), contending that such a measure would "likely obstruct the delisting" of Mexican wolves and was "based on

1    exaggerated concerns about inbreeding depression in the wild." SOF ¶100. Instead,

2    AZGFD urged FWS to require only genetic recovery "action[s]," not improvement on

3    genetic metrics. *Id.* But by choosing to use a proxy that requires no breeding or

4    measurable improvement in genetic status, FWS could achieve the genetic objective

5    without improving the U.S. wild population's genetic health, thus leaving this population

6    in a state of extreme genetic peril even while its chosen genetic objective indicated

7    success.

8        Peer reviewers of the proposed Revised 10(j) Rule objected to the genetic

9    objective on these grounds, stating that: the genetic objective "is not well justified and

10   instead should be replaced with genetic monitoring of the wild population coupled with

11   releases from the captive population" (Reviewer 3); "not only is it necessary to achieve

12   integration of the 22 individuals, but it is also necessary to achieve the genetic outcomes"

13   (Reviewer 4); and "I still do not understand why a direct measure of 'genetic health' of

14   the population is not used for defining the target" (Reviewer 5). SOF ¶185. Other experts,

15   including participants in the most recent and prior recovery planning efforts, also

16   submitted comments raising the same concerns. SOF ¶186. And these peer reviews and

17   expert commenters echoed nearly identical concerns raised during peer review of the

18   2017 Recovery Plan. SOF ¶187 ("If genetic diversity is the key metric here, why not

19   define a target based directly on it and not an indirect measure that may or may not

20   reflect population status?").

21       FWS did not meaningfully respond to these objections. FWS explained that when

22   it meets the genetic objective, it estimates—based on the Miller PVA—that "90 percent

23   of the gene diversity available in captivity will have been transferred to the MWEPA"—a

24   level of genetic infusion FWS deemed sufficient "to alleviate the risk of genetic threats in

25   the MWEPA such as inbreeding, lack of heterozygosity [gene diversity], and lack of

26   adaptive potential." SOF ¶156. But while FWS explained *how it derived* the genetic

27   objective, FWS provided no explanation of *why it was rational* to use a proxy measure

28   based on a modeling study, instead of an actual, direct measure of genetic diversity that is

already in use, to mark the endpoint of its critical genetic-recovery efforts. The omission of any such explanation was especially troubling given the Miller PVA author's own acknowledgement that the PVA relied on "a long list of measurement uncertainties across a range of model input variables," and, therefore, any "management guidelines and targets emerging from this PVA should be viewed as guideposts" rather than precise targets. SOF ¶¶174-75. By ignoring such uncertainties in choosing modeling over measuring, FWS failed to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (cleaned up).

Moreover, even if FWS had explained why it was foregoing actual genetic metrics for a proxy, its choice to do so would nonetheless have been impermissible because, as discussed above, the Miller PVA is not a reliable model on which to base such a proxy. When FWS uses a model-based proxy in lieu of directly measuring impacts to wildlife that the agency is responsible for protecting, the proxy is permissible only if the model "reasonably ensures that the proxy results mirror reality." *Gifford Pinchot Task Force*, 378 F.3d at 1065–66 (cleaned up). That means FWS only may "use proxy modeling … so long as that proxy has a high correlation" with what it is a proxy for. *Id.* at 1066 n.4. But here, as demonstrated in Point III.B above, the Revised 10(j) Rule's genetic proxy does not "reasonably ensure" that genetic threats have been alleviated or even that the wild population will retain 90% of the captive population's future genetic diversity. For this reason, too, FWS's use of a proxy for the genetic objective was irrational. *See Fund for Animals v. Babbitt,* 903 F. Supp. 96, 114 (D.D.C. 1995), *amended* 967 F. Supp. 6 (D.D.C. 1997) (arbitrary for agency to use "females with cubs" proxy for overall population growth without rational explanation of reliability).[7]

---

[7] This District's 2021 ruling on the 2017 Recovery Plan rejected a challenge to its 22-wolf genetic delisting criterion, but the court in that case was solely addressing the question whether the criterion was so facially deficient that FWS had effectively "failed to include *any* delisting criteria in the Plan to address genetic threats." *Ctr. for Biological Diversity v. Haaland*, 562 F. Supp. 3d at 85 (emphasis added). Thus, that decision addressed a different issue and does not

1

2

**D.      The Revised Rule's Take Provisions are Unsupported and Fail to Provide for Species Recovery.**

3      The Revised 10(j) Rule also fails to remedy the defects that this District identified

4  with the 2015 10(j) Rule's expanded take provisions. The 2018 Remand Order held that

5  those take provisions—which allowed for expanded permitting of take on federal land,

6  non-federal land, and in response to "unacceptable impacts" to wild ungulate herds—"do

7  not contain adequate protection for the loss of genetically valuable wolves." *Ctr. for*

8  *Biological Diversity*, 2018 WL 1586651, at *15. Thus, the take provisions did not

9  comport with "the ESA's conservation purpose" or the requirement that taking permits

10  "not operate to the disadvantage" of the Mexican wolf. *Id.* (quoting S. Rep. No. 97-418

11  at 8).

12      FWS claimed to have remedied these deficiencies in the Revised 10(j) Rule by

13  conditioning the availability of these expanded taking options on its achievement of the

14  22-wolf genetic objective or of interim benchmarks reflecting progress toward that

15  objective. But because the genetic objective itself is unsupported by rational analysis, as

16  discussed above, tying the take provisions to that flawed objective does not save them.

17  Instead, FWS has again failed to afford "adequate protection for the loss of genetically

18  valuable wolves." *Ctr. for Biological Diversity*, 2018 WL 1586651, at *15.

19

**E.      FWS Arbitrarily Retained the I-40 Boundary and Failed to Consider its Recovery-Impeding Impact.**

20      Although Mexican wolf experts have explained that long-term recovery will

21  require the establishment of a metapopulation consisting of three separate but connected

22

23  ─────────────

24  address the questions presented here. Indeed, the court held that, in litigation challenging a recovery plan, the issue of whether the genetic criterion rationally provided for long-term species

25  recovery was *not* subject to judicial review and noted that delisting criteria "are not subject to the same level of scrutiny" in a recovery plan challenge "as they might be where an action is taken to

26  put into effect portions of the plan, pursuant to another section of the ESA." *Ctr. for Biological Diversity v. Zinke*, 399 F. Supp. 3d at 948. Moreover, after FWS issued a revised recovery plan

27  in 2022, the 9th Circuit dismissed as moot plaintiffs' appeal from the district court's 2017 Recovery Plan rulings. *WildEarth Guardians*, 2023 WL 8613628, at *1. Thus, the challenges

28  Plaintiffs raise here have not been and will not be addressed in the Recovery Plan litigation.

populations of Mexican wolves in the United States, two of which would be located in large areas of suitable habitat north of I-40, the Revised 10(j) Rule arbitrarily retains the I-40 MWEPA boundary and declares FWS's intent to capture any Mexican wolves who venture beyond it. Indeed, in promulgating the challenged Rule, FWS treated the I-40 boundary as a fait accompli and refused even to consider its impact on Mexican wolf recovery. SOF ¶188. However, the area Mexican wolves are allowed to inhabit, and its ability to support the multiple, resilient populations needed for recovery, is a crucial issue in determining the success of recovery efforts. SOF ¶¶55-71. By refusing to consider it, FWS failed to base the Revised 10(j) Rule "on consideration of the relevant factors." *State Farm*, 463 U.S. at 42.

FWS's stated reasons for avoiding consideration of the I-40 boundary's impacts do not withstand scrutiny. At the outset, FWS wrongly asserted that the issue is beyond the scope of the 2018 Remand Order. SOF ¶¶124-25, 188. To the contrary, the 2018 Remand Order held that the "[2015 10(j)] rule *as a whole* fails to further recovery." *Ctr. for Biological Diversity*, 2018 WL 1586651, at *17 (emphasis added). And while the 2018 Remand Order did not specifically hold the I-40 boundary invalid, it nonetheless opined that the boundary "fail[s] to remedy" the 2015 10(j) Rule's deficiencies and "threaten[s] to compound the problem," noting that "although FWS acknowledges that territory north of I-40 will likely be required for future recovery … it nevertheless imposed a hard limit on dispersal" and failed to justify "the insufficient geographic range that is provided by the present rule." *Id.* at *14 n.13. Thus, the 2018 Remand Order at least demanded that FWS rationally explain why retaining the I-40 boundary and capturing Mexican wolves that roam further north provides for Mexican wolf conservation in the context of the Revised 10(j) Rule's management framework as a whole.

Moreover, regardless of the 2018 Remand Order, FWS still had an ESA obligation to ensure that the Revised 10(j) rule "provide[s] for the conservation" (i.e. recovery) of Mexican wolves and thus needed to consider the impacts on Mexican wolf recovery of

maintaining the I-40 boundary. 16 U.S.C. § 1533(d); *see also id.* § 1539(j)(2)(A) (ESA section 10(j) designation must "further the conservation" of the species). FWS cannot evade its statutory duty simply by deciding to limit the issues it is willing to consider.

FWS failed that statutory duty here. FWS asserted that the "boundaries of the MWEPA are consistent with the recovery strategy established in the revised recovery plan." SOF ¶189. Yet as this District has already ruled, FWS's asserted reliance on the 2017 Recovery Plan does not insulate the agency from the ESA requirement to rationally justify its Revised 10(j) Rule:

> Whatever the force of a recovery plan under the ESA, the 10(j) rule must "further the conservation of [the] species." … As previously stated by this Court, "the substance or terms of future recovery actions, do not relieve FWS of its obligations under Section 10(j)."

*Ctr. for Biological Diversity v. Zinke*, 2019 WL 12265875, at *8 n.8 (D. Ariz. Mar. 29, 2019) (quoting 16 U.S.C. § 1539(j)(2)(A)).

Here, FWS's claimed reliance on the Recovery Plan does not meet those obligations. Noting that the 2017 Recovery Plan's strategy was "to establish and maintain *a minimum of two* resilient, genetically diverse Mexican wolf populations," FWS briefly asserted in the FSEIS that the Miller PVA and the Martinez-Meyer (2017) study "support our geographic focus because they predict that" the MWEPA (limited to south of I-40) and the northern Sierra Madre Occidental region of Mexico "*each* … can support a viable Mexican wolf population." SOF ¶190 (emphasis added). Thus, FWS acknowledged that its choice to limit Mexican wolf recovery in the United States to a single, isolated population south of I-40 depends on the reasonableness of the prediction that a second "resilient, genetically diverse" population will be established in Mexico.

But neither Martinez-Meyer (2017) nor the Miller PVA rationally supported that prediction. Martinez-Meyer (2017) ignored essential factors. The study used modeling based on climate, vegetation, and certain other information to assess potential wolf habitat suitability south of I-40. SOF ¶191. But unlike prior Mexican wolf habitat-

32

suitability assessments, Martinez-Meyer (2017) did not attribute any import to land ownership, i.e. public land subject to wildlife protections vs. private land used for commercial gain. SOF ¶¶192, 202. FWS considers federal lands to have "the most appropriate conditions" for Mexican wolves. SOF ¶193. A "landscape of fragmented private holdings," by contrast, is problematic for wolves, who must be managed to avoid livestock conflicts and other risks. SOF ¶194. Yet, Mexico has very little public land; indeed, Martinez-Meyer (2017) noted that "most of [the] high-suitable areas for wolves in Mexico are private lands, thus diversified conservation strategies are needed." SOF ¶¶195-96. The study did not discuss what "diversified conservation strategies" would be necessary to enable wolves to survive on these private lands, nor whether they exist or would likely be successful—and FWS never filled that gap either. SOF ¶196.

Yet, illegal mortality from private killing of wolves has always been the greatest source of Mexican wolf mortality, and early reintroduction efforts in Mexico showed this to be a major problem there as well. SOF ¶197. Of the first 14 wolves that Mexico released into the wild, 11 died within three years, including six confirmed illegal killings, three presumed illegal killings, and one disappearance of unknown cause. *Id.* Further, a Mexico wildlife official told FWS that obtaining written permission from private landowners before releasing wolves was a "time consuming process" that had resulted in only four authorizations despite "many years" of efforts. SOF ¶198. Thus, the omission of land ownership status from the Martinez-Meyer (2017) study made habitat in Mexico appear far more "suitable" to support a second wild population than it actually is.

In addition, although prey availability is one of "the most important habitat attributes" for Mexican wolves SOF ¶199, the Martinez-Meyer (2017) study lacked reliable data on the density of potential wolf prey (i.e., deer and other ungulates) in Mexico. The study noted that "information on ungulate density in Mexico is still poor," and cautioned that "[i]t is necessary to carry out systematic, extensive field surveys to produce reliable density estimates and range-wide models to be incorporated in the habitat suitability analysis," describing such work as an "urgent next step." SOF ¶204.

1    And while high prey density benefits wolves, high livestock density puts them at risk of

2    conflict with livestock and resulting killing or removal. SOF ¶200. Yet Martinez-Meyer

3    (2017) did not take livestock density into account either, even though livestock are

4    abundant in the areas of Mexico where reintroduction has occurred. SOF ¶201.

5           As a result of these omissions, it was irrational for FWS to rely on Martinez-

6    Meyer (2017) to conclude that Mexico could support a self-sustaining, long-term,

7    genetically healthy Mexican wolf population, such that no additional United States

8    population was needed for recovery. Indeed, Dr. Carroll and Michael Phillips, authors of

9    previous Mexican wolf habitat-suitability assessments, informed FWS that these very

10   factors—"abundant livestock, limited data on wild prey, and complex land ownership

11   patterns"—had led Carroll and others to deem the results of their prior habitat analyses

12   for Mexico to be "too tentative … to be of foundational importance to Mexican wolf

13   recovery." SOF ¶205. Similarly, a FWS-assigned peer reviewer of Martinez-Meyer

14   (2017) opined that "the number of assumptions, potential biases, lack of data, and

15   reliance on information from other populations makes it difficult to place a great deal of

16   faith in these results." SOF ¶206. FWS's response to this comment was simply

17   "Comment noted." *Id.*

18          FWS, however, ignored not only these external red flags but also those raised by

19   the primary author of the study himself. Presenting the habitat assessment results to FWS,

20   Dr. Martinez-Meyer explained that "the habitat assessment should be viewed as

21   preliminary information that can be used to stimulate field work to verify results, gather

22   additional information (particularly on ungulates), and consider social tolerance." SOF

23   ¶207. Similarly, the study itself noted that because "reintroduction efforts are still in an

24   early stage … in Mexico," and the "level of human intervention is high," it was

25   "impossible to draw any conclusions regarding the potential carrying capacity in Mexico"

26   (i.e. the number of wolves that Mexican habitat could support). SOF ¶208. Yet instead of

27   using Martinez-Meyer (2017) as a preliminary foundation for further analysis, FWS

28   irrationally cited it and the Miller PVA as conclusive evidence that the fledgling Mexico

population would supply the second resilient wild population FWS admits is needed for Mexican wolf recovery and eliminate the need for a U.S.-based metapopulation. SOF ¶190. *See Tucson Herpetological Soc'y*, 566 F.3d at 879 (FWS irrationally relied conclusively on study despite author's warning that results "should be viewed with caution" due to "sparse data" and should serve as "baseline for future monitoring").

As for the Miller PVA, it too did not rationally support FWS's conclusion that Mexico would reliably supply a resilient, genetically diverse population. As discussed above, in Point III.B, the Miller PVA's projections underestimated long-term extinction risk and genetic loss and thus offered no rational support for that conclusion. And the Miller PVA's projections were even more unreliable for Mexico than they were for the United States because the model based its parameter assumptions on data from the U.S. population only. To take one example, the model assumed that mortality rates in Mexico and the U.S. would be identical, even though the fledgling Mexico reintroduction project was plagued with extreme mortality rates, as evidenced by the death within three years of 11 of the 14 wolves that had been introduced there through 2014. SOF ¶209.

Moreover, the Mexico population's struggles in the years between the Miller PVA and the Revised 10(j) Rule further undermined FWS's reliance on the Miller PVA regarding Mexico. In fact, the Mexico population was performing far worse than the Miller PVA had projected. In the modeled scenarios that FWS relied on in setting the genetic and population objectives, the Miller PVA projected 100 wild wolves in Mexico by the end of 2022, with at least 25 having survived to breeding age. SOF ¶210. But as of 2022 there were only "around 45" wild wolves in Mexico, and just four released wolves had survived to breeding age as of the end of 2021. SOF ¶¶211-12. Yet FWS took no account of this information in continuing to rely on the Miller PVA and Martinez-Meyer (2017) to justify managing for a single, U.S. wild population, despite the Miller PVA author's warning that any conclusions drawn from the study must be "frequently reviewed and adjusted as new data are available," and despite the Martinez-Meyer (2017)

1  author's warning that his study should be viewed as "preliminary information that can be
2  used to stimulate field work to verify results." SOF ¶¶175, 207.

3         In sum, FWS's continued reliance on the Miller PVA and Martinez-Meyer (2017)
4  to predict a resilient and growing wolf population in Mexico, without explaining why
5  those studies were reliable in light of their admitted uncertainty on this issue, conflicting
6  evidence, and recent experience that defied their forecasts, was arbitrary and capricious.
7  For this reason too, FWS's proffered justification for refusing to consider any
8  modification of the I-40 boundary was unlawfully arbitrary. *See Ctr. for Biological*
9  *Diversity v. Zinke*, 900 F.3d at 1068-69 (agency failed to reasonably explain analytical
10 approach and disregard of conflicting evidence); *Native Ecosystems Council v. Tidwell*,
11 599 F.3d 926, 935 (9th Cir. 2010) (agency irrationally relied on predictive model without
12 validating results with wildlife population monitoring); *Tucson Herpetological Soc'y*, 566
13 F.3d at 879 (agency ignored scientist's caution on his study's limitations).[8]

14 **IV.    FWS Violated NEPA**

15        FWS's environmental analysis of the Revised 10(j) Rule in the FSEIS violated
16 NEPA. NEPA "is our basic national charter for protection of the environment." *Sierra*
17 *Forest Legacy v. Sherman*, 646 F.3d 1161, 1177 (9th Cir. 2011) (quoting 40 C.F.R. §
18 1500.1(a) (2014)). Its twin goals are to ensure that federal agencies "consider every
19 significant aspect of the environmental impact of a proposed action" and inform the

---

[8] To the extent FWS claims that it relied on its then-current regulation, 50 C.F.R. § 17.81(a)
(2022), to reject expanding the MWEPA north of I-40, such reliance would constitute legal error.
That former regulation stated that an experimental population may be reintroduced outside of its
probable historic range only upon a finding that the "primary habitat of the species has been
unsuitably and irreversibly altered or destroyed." 50 C.F.R. § 17.81(a) (2022). But FWS
undertook no consideration of whether that limitation was satisfied, given the continuing
struggles of the Mexican population. Further, FWS recently amended the regulation to remove
that limitation and, in doing so, acknowledged that the "unsuitably and irreversibly altered or
destroyed" requirement has no basis in the ESA. *See* Endangered and Threatened Wildlife and
Plants; Designation of Experimental Populations, 88 Fed. Reg. 42642, 42649 (July 3, 2023)
("[T]his final rule is consistent with our statutory authority because the only applicable
requirement for an experimental population is to be 'wholly separate geographically from
nonexperimental populations of the same species.'").

1    public of the environmental impacts of their proposals. *Kern v. U.S. Bureau of Land*

2    *Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002) (cleaned up); *see also* 42 U.S.C. § 4332(C).

3    In this way, "NEPA ensures that the agency will not act on incomplete information, only

4    to regret its decision after it is too late to correct." *Marsh v. Or. Nat. Res. Council*, 490

5    U.S. 360, 371 (1989).

6        FWS violated NEPA in promulgating the Revised 10(j) Rule by: (1) failing to take

7    the requisite "hard look" and ensure the scientific integrity of its environmental analysis;

8    and (2) failing to consider a reasonable range of alternatives.

9        **A.    FWS Failed to Take a Hard Look at the Impacts of the Revised 10(j)**
         **Rule and Failed to Ensure the Scientific Integrity of its Analysis.**

10

11       First, FWS's environmental analysis of the Revised 10(j) Rule falls short of

12   NEPA's requirement that federal agencies take a "hard look" at the environmental

13   impacts of their decisions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332,

14   350 (1989); *see also* 42 U.S.C. § 4332(C). "A 'hard look' includes considering all

15   foreseeable direct and indirect impacts" and "should involve a discussion of adverse

16   impacts that does not improperly minimize negative side effects." *N. Alaska Env't. Ctr. v.*

17   *Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006) (cleaned up).

18       The quality of the information on which an EIS is based is critical to its legitimacy

19   as a decision-making tool and its compliance with NEPA. Thus, NEPA requires agencies

20   to "ensure the professional integrity, including scientific integrity, of the discussions and

21   analysis" in an EIS. 42 U.S.C. § 4332(D). Conversely, it follows that agencies must

22   ensure that EISs are not grounded on "incorrect assumptions or data." *Native Ecosystems*

23   *Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005) (citing 40 C.F.R. §

24   1500.1(b) (2014)); *see, e.g., Native Ecosystems Council v. Tidwell*, 599 F.3d at 937

25   (holding that agency failed to give "hard look" by using flawed scientific methodology).

26

27

28

37

1    Further, "an agency errs when it relies on old data without showing that the data remain

2    accurate." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1052 (9th Cir. 2013).[9]

3    Here, as detailed above in discussions that are equally pertinent under NEPA's

4    standards, FWS failed to take a hard look at the environmental impacts of its decision by:

5    (1) grounding its Mexican wolf impacts analysis on the flawed Miller PVA, which

6    incorporated unjustified, overly optimistic assumptions and data and as a result

7    underestimated extinction risk and genetic loss. *See supra,* Point III.B.1;

8    (2) relying on the scientifically unsound assumption that genetic problems would

9    no longer threaten Mexican wolf recovery if the wild population maintained 90% of the

10   captive population's deteriorated genetic diversity after 100 years. *See supra*, Point

11   III.B.2;

12   (3) relying on the Miller PVA without including buffers or guardrails to account

13   for its uncertainties. *See supra*, Point III.B.3;

14   (4) failing to rationally explain its choice of a model-based proxy for genetic

15   recovery in lieu of actual genetic outcomes. *See supra*, Point III.C; and

16   (5) failing to analyze the impact of precluding Mexican wolves from dispersing

17   and establishing populations north of I-40 and retaining the I-40 boundary based on

18   flawed and unreliable studies that incorporated incorrect assumptions, omitted relevant

19   factors, and were undermined by subsequent information that FWS failed to consider. *See*

20   *supra*, Point III.E.[10]

21   **B.    FWS Unlawfully Failed to Consider a Reasonable Range of
             Alternatives.**

22
     FWS further violated NEPA by failing to consider a reasonable range of
23
     alternatives. FWS considered only a *single* alternative that even purported to comply with
24

25
     ─────────────────────────
26   [9] This brief cites to the Council on Environmental Quality NEPA regulations in effect in
     2014, which govern FWS's environmental review in this case because it is a supplement
27   to the 2014 FEIS, as FWS stated in the 2022 FSEIS (FWS027770). *See* 40 C.F.R. §
     1506.13 (2022).
28   [10] All of these issues were raised in comments to FWS. SOF ¶120.

the ESA, and failed to analyze in detail any alternative that expanded the MWEPA north of I-40 (or otherwise allowed Mexican wolves to inhabit areas north of I-40) or included more wolf-protective population and genetic objectives and take provisions. NEPA requires federal agencies to "rigorously explore and objectively evaluate all reasonable alternatives" to their proposed actions. 40 C.F.R. § 1502.14(a) (2014); *accord* 42 U.S.C. § 4332(C)(iii). The discussion of alternatives "is the heart of the environmental impact statement," which must "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14 (2014). "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005) (cleaned up). The reasonableness of an agency's range of alternatives "is to some degree circumscribed by the scope of the [EIS's] statement of 'purpose and need'" for the agency's action, "but the statement cannot unreasonably narrow the agency's consideration of alternatives so that the outcome is preordained." *Env't. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 876 (9th Cir. 2022) (cleaned up).

1.    Only One of the Alternatives Even Attempted to Comply with the ESA.

FWS violated NEPA's range-of-alternatives requirement because *only one* of the alternatives FWS considered in detail even purported to address all elements that the 2018 Remand Order found to violate the ESA. The FSEIS considered in detail just three alternatives: (1) the Revised 10(j) Rule; (2) an alternative with the population and genetic objectives of the Revised 10(j) Rule but retaining the invalidated expanded take provisions from the 2015 10(j) Rule; and (3) the "no action" alternative (i.e. the invalidated 2015 10(j) Rule). SOF ¶123. Because the 2018 Remand Order held that the 2015 10(j) Rule, including its expanded take provisions, unlawfully failed to provide for species recovery, *only one* of those three alternatives even attempted to comply with the ESA. But the agency could hardly adopt a rule or provisions already held illegal. Thus, the resulting single alternative "preordained" the outcome and violated NEPA's range-of-

alternatives requirement. *Env't. Def. Ctr.*, 36 F.4th at 876; *see Flaherty v. Bryson*, 850 F. Supp. 2d 38, 73 (D.D.C. 2012) (environmental assessment that considers only one lawful alternative violates NEPA).

> 2.    FWS Arbitrarily Failed to Consider Reasonable, More Wolf-Protective Alternatives.

FWS also violated NEPA by failing to consider any alternatives that would expand the MWEPA north of I-40 or allow Mexican wolves to inhabit areas north of I-40 without being captured and removed, set a larger population objective, set a more aggressive and directly measured genetic objective, or include adequate protections against the taking of genetically valuable wolves. Such alternatives were plainly feasible. Indeed, FWS has acknowledged that large areas of suitable Mexican wolf habitat exist north of I-40 (SOF ¶67) and there was no reason FWS could not have adopted more protective population and genetic objectives or take provisions. In these circumstances, NEPA required FWS to consider such alternatives in detail, as many commenters requested (SOF ¶121). *See W. Watersheds Project*, 719 F.3d at 1051 (agency violated NEPA where alternatives lacked variation on key issue); *Nat. Res. Def. Council*, 421 F.3d at 814 (EIS violated NEPA where it omitted alternatives allocating less than 50% of unspoiled area to development).

Moreover, FWS improperly excluded the north-of-I-40 alternatives by unreasonably narrowing the "purpose and need" for its action. The FSEIS stated that FWS's purpose and need was to "ensure compliance" with the 2018 Remand Order by addressing only "the following narrowly defined issues": population size, genetic needs, expanded take provisions, and essentiality. SOF ¶124. Only alternatives "limited to the scope" of those narrowly defined issues would be considered. SOF ¶125. However, the 2018 Remand Order was not so narrow, holding instead that the "[2015 10(j)] rule *as a whole* fails to further recovery," and expressly questioning the I-40 boundary's validity. *Ctr. for Biological Diversity*, 2018 WL 1586651, at *14 n.13, *17 (emphasis added). Just as important, the ESA is not so narrow. Rather, it required that the 10(j) Rule "provide for the conservation" of Mexican wolves. 16 U.S.C. § 1533(d). FWS's narrowly defined

40

"purpose and need" statement improperly precluded consideration of reasonable alternatives—such as allowing wolves to establish populations north of I-40—that would meet that statutory directive. *See Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 866 (9th Cir. 2004) ("statutory objectives … serve as a guide by which to determine the reasonableness" of scope of alternatives).

Excluding any north-of-I-40 alternative was no accident. While an earlier FWS draft identified the agency's purpose more broadly, FWS narrowed it after an Arizona government attorney warned that if FWS stated its purpose as serving the Mexican wolf's recovery needs—as the ESA requires—then FWS would be vulnerable to claims that it had not considered an alternative that would "ensur[e] adequate habitat availability" and that the FSEIS had not "address[ed] the adequacy of habitat and prey populations." SOF ¶126. Accordingly, FWS's purpose and need statement "unreasonably narrow[ed]" the range of alternatives FWS considered. *Env't. Def. Ctr.*, 36 F.4th at 876; *see Nat'l Parks Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070, 1072 (9th Cir. 2010) (agency violated NEPA by allowing private objectives to preclude consideration of reasonable alternatives).

## V.   The Court Should Remand the Revised 10(j) Rule

To remedy FWS's unlawful conduct, this Court should declare the Revised 10(j) Rule unlawful, remand it to FWS, and require FWS to finalize a replacement rule within one year after this Court's judgment. Plaintiffs adopt the remand-without-vacatur argument advanced by plaintiffs in the consolidated case (4:22-cv-00453) to support this request.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for summary judgment and remand the Revised 10(j) Rule.

41

1    Respectfully submitted this 19th day of April, 2024.

2

3                                    /s/ Aaron M. Bloom

4                                    Aaron M. Bloom (*admitted pro hac vice*)
                                     New York Bar No. 4247714
5                                    Earthjustice
                                     48 Wall Street, 15th Floor
6                                    New York, NY 10005
                                     abloom@earthjustice.org
7                                    Phone: (917) 410-8727

8

9                                    Timothy J. Preso (*admitted pro hac vice*)
                                     Montana Bar No. 5255
10                                   Earthjustice
                                     313 East Main Street
11                                   Bozeman, MT  59715
                                     tpreso@earthjustice.org
12                                   Phone: (406) 586-9699

13

14                                   *Attorneys for Plaintiffs Center for Biological
                                     Diversity and Defenders of Wildlife*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

42

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

I certify that the foregoing brief contains 13,989 words, as counted by Microsoft Word, excluding the items excluded the word limit in paragraph F of the Court's January 19, 2023 scheduling order (ECF #22).

/s/ Aaron M. Bloom