**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Center for Biological Diversity, et al.,

        Plaintiffs,

v.

Deb Haaland, et al.,

        Defendants.

No. CV-22-00303-TUC-SHR(L)
No. CV-22-00453-TUC-SHR(C)

**Order Re: Motions for Summary Judgment**

Pending before the Court are: (1) Plaintiffs Center for Biological Diversity and Defenders of Wildlife's (collectively, "Lead Plaintiffs") Motion for Summary Judgment (Docs. 55, 56), (2) Plaintiffs Grand Canyon Wolf Recovery Project, New Mexico Wilderness Association, Western Watersheds Project, WildEarth Guardians, and Wildlands Network's (collectively, "Consolidated Plaintiffs") Motion for Summary Judgment (Docs. 58, 59), (3) Defendants Deb Haaland and United States Fish and Wildlife Service's (collectively, "Lead Defendants") Cross-Motion for Summary Judgment (Docs. 63, 64), (4) Defendants Deb Haaland, United States Department of the Interior, United States Fish and Wildlife Service, and Martha Williams' (collectively, "Consolidated Defendants") Cross-Motion for Summary Judgment (Docs. 77, 78); (5) Intervenor-Defendant State of Arizona's Cross-Motion for Summary Judgment in the Lead Case (Docs. 67, 68), (6) Intervenor-Defendant State of Arizona's Cross-Motion for Summary Judgment in the Consolidated Case (Docs. 81, 79), and (7) Plaintiffs' Motion for Judicial

Notice (Doc. 86). The motions for summary judgment have been fully briefed, and amicus curiae has filed a brief in support of Federal Defendants in both cases (Doc. 76). The Court held oral argument on March 5, 2025. (*See* Doc. 102.) For the reasons below, the Court denies Plaintiffs' Motions for Summary Judgment (Docs. 55, 58) and grants Defendants' Cross-Motions for Summary Judgment (Docs. 63, 67, 77, 81).

## I.   Factual and Procedural Background[1]

Plaintiffs challenge a rule the United States Fish and Wildlife Service (FWS) promulgated to conserve the Mexican gray wolf ("Mexican wolf") in response to a remand regarding a prior version of the rule in this District. *See generally Ctr. for Biological Diversity v. Jewell*, No. CV-15-00019, 2018 WL 1586651 (D. Ariz. Mar. 31, 2018) (the "2018 Remand Order").

### a.   The Mexican Wolf

The Mexican wolf "is the rarest, southern-most occurring, and most genetically distinct subspecies of all the North American gray wolves." (FWS029324; *see also* FWS027771.) Historically, Mexican wolves inhabited portions of the southwestern United States and central and northern Mexico. (FWS032661; FWS030063; FWS029324; FWS029965–66.) Although once comprised of thousands of wolves, the Mexican wolf population declined rapidly in the first half of the 20th century due to "Federal, state, and private predator control and eradication efforts." (FWS029324; *see also* FWS029480.) By the early 1970s, the species was considered extinct. (FWS029324.) As a result, FWS listed the species, then a subspecies of the entire gray wolf species, as endangered under the Endangered Species Act (ESA) in 1976. (FWS029322.) From 1980 until FWS began its reintroduction project in 1998, no wild Mexican wolf populations were known to exist in either the United States or Mexico. (FWS029324.) FWS captured the last Mexican wolves from the wild in Mexico between 1977 and 1980, and these seven wolves became the

---

[1] This background section references the undisputed facts contained within the administrative record. References to the administrative record use the Bates numbers as designated by the parties. The Court has taken all statements of fact and controverting statements of fact (Docs. 57, 65, 66, 69, 80, 88, 90, 91) into account when determining which facts are material.

founding members of a captive breeding program established to rescue the subspecies. (FWS029967.)  This program prevented the subspecies' extinction and ultimately provided Mexican wolves for reintroduction into the wild.  (*Id.*)

**b.  <u>The Reintroduction Program & Recent Status</u>**

In 1982, FWS published its first Mexican Wolf Recovery Plan.  (*See* FWS036437–542.)  The Plan's objective was to reestablish a viable, self-sustaining population of at least 100 Mexican wolves in the wild.  (FWS036461.)  Accordingly, in 1998, FWS released 11 Mexican wolves, bred and reared in captivity, into an area called the Blue Range Wolf Recovery Area (BRWRA).  (FWS029327; FWS029966.)  FWS released these wolves under ESA Section 10(j)'s experimental population provision, which modifies the ESA's otherwise applicable prohibitions to facilitate reintroductions.  (*See* FWS029053.)  At the same time, FWS promulgated a rule determining that all released wolves would be deemed "nonessential."  (FWS029054.)

Since 1998, FWS has released more Mexican wolves into the BRWRA. (FWS029334–35; FWS027769.)  As a result, by the end of 2021, a minimum of 196 wild wolves inhabited what is called the Mexican Wolf Experimental Population Area (MWEPA), encompassing the states of Arizona and New Mexico south of Interstate 40 (I-40).  (FWS032662–63.)  While FWS was managing the reintroduction in the United States, a similar program began in Mexico in 2011.  (FWS032664; FWS029336.)  As a result, around 45 Mexican wolves inhabited a portion of the Sierra Madre Occidental in northern Mexico as of 2022.  (FWS032664.)

***i.  Genetics***

Unfortunately, "Mexican wolves have pronounced genetic challenges" due to "the small number of founders upon which the captive population was established" and "the near extirpation" in the wild.  (FWS029979–80.)  "These challenges include inbreeding (mating of close relatives), loss of heterozygosity (a decrease in the proportion of individuals in a population that have two different alleles for a specific gene), and loss of adaptive potential, three distinct but interrelated phenomena."  (FWS029980.)  Although

"[i]nbreeding can occur in any population," it "is most likely to occur in small populations due to limited choice of mates." (*Id.*) To mitigate these genetic challenges, FWS takes various measures, including strategically releasing captive wolves and cross-fostering captive-born pups in the wild. (FWS038508; FWS32004; FWS038752.)

As of 2021, the captive population had maintained 82.49% of the gene diversity of its founders. (FWS035324.) This percentage is "lower than the recommended retention of 90% for most captive breeding programs." (FWS038065.) The 1994 master plan recovery goal was set to "retain 75% gene diversity for a period of 50 years with a managed population of 250 wolves." (FWS035333.) With the current gene diversity of 82.49% and current space limitations of 300 captive wolves, "retaining 75% gene diversity for 60 years from present is possible." (*Id.*) Additionally, as of 2021, the wild population retained 76.23% of the founders' gene diversity. (FWS035334.)

These percentages reflect many underlying genetic metrics FWS actively studies in the Mexican wolf population. For example, FWS measures the "founder genome equivalent" (FGE), which is "the number [of] wild-caught individuals (founders) that would produce the same amount of gene diversity as does the population under study." (FWS035402.) FWS also measures the "mean kinship," which describes how related the wolves are on average. (FWS038067.) From 2017 to 2021, the U.S. wild population's mean kinship went down, meaning the wolves were becoming less related to each other. (FWS035334, 035403.)

### ii. *Feeding Program*

Since 2009, FWS has managed a supplemental/diversionary feeding program, meaning it provides food caches to wild Mexican wolves. (FWS038058, 038064; FWS027979–80.) Supplemental feeding serves to boost survival with extra nutrition, and diversionary feeding helps divert wolves from livestock. (FWS038058, 038064.) In 2017, FWS explained "[d]iversionary food caches have been used on increasing proportions of the population since 2009, providing about 10 pounds of meat per wolf every two to three days sometimes for several months when the likelihood of depredations [is] high (e.g.,

during denning season)." (FWS038064.) The level of feeding changes based on the needs of the population. For instance, in 2016 and 2017, FWS "provided diversionary feeding for approximately 70% of the breeding pairs during denning season." (*Id.*; *see also* FWS038103.) These feeding programs have increased average litter sizes, lowered rates of mortality, and decreased removals from the wild. (FWS038100; FWS038160; FWS038064; FWS030358.)

### iii. Removals

Between 1998 and 2019, FWS authorized or carried out the removals of 206 Mexican wolves from the reintroduced population. (FWS027936.) Many removals were temporary or involved relocations of wolves within the MWEPA area. (FWS039145; FWS023512; FWS037204, 037267–68.) The number of removals has decreased since 2009 with the discontinuation of Standard Operating Procedure 13, which prescribed removal of wolves that had been involved in 3 incidents within 365 days, in response to removal rates FWS considered "too high to allow recovery." (FWS037204, 037210.) Although some removals have included genetically valuable individuals (*see* N043404), "[m]any considerations are taken into account when determining whether to remove wolves, including the status of the population and the genetics of individual wolves." (FWS038071.)

### iv. Geographic Boundaries

When the first 11 wolves were released in 1998, FWS restricted them to the BRWRA. (FWS029286; FWS029327.) However, in 2015, FWS expanded the area Mexican wolves would be permitted to occupy to include all of the area south of I-40 in Arizona and New Mexico, i.e., the MWEPA. (FWS033836–37.) When wolves leave this area and are discovered, FWS captures and returns them to the MWEPA or places them in captivity. (FWS032665.) Although a prior habitat-suitability assessment identified two areas of suitable habitat north of I-40 (FWS029360–62), FWS relied on a newer habitat-suitability assessment, Martinez-Meyer (2017), in maintaining its I-40 boundary for the MWEPA, (FWS027958.)

1    **c. 2015 10(j) Rule & Ensuing Litigation**

2         In 2013, FWS began the process of revising the Section 10(j) Rule for the MWEPA

3    population.  (*See* FWS029989–90.)   Between 2009 and 2013, the MWEPA population

4    nearly doubled in size (FWS039145), so the revision was intended, in part, to expand the

5    MWEPA area to allow for further growth of the wild population.   (FWS030016.)

6    Accordingly, FWS increased the population objective from 100 wolves to between 300 and

7    325 wolves in the 2015 10(j) Rule.  (FWS030024.)  While crafting this rule, FWS consulted

8    many stakeholders, including the Arizona Game and Fish Department (AZGFD), regarding

9    this objective and other aspects of the rule.  (*See* FWS029991–92.)   FWS estimated when

10   the revised population objective is met, "the population will have a 90 percent likelihood

11   of persistence over 100 years."  (FWS032661.)

12        In addition to the population objective increase, the 2015 10(j) Rule included other

13   changes.   For example, as to the number of "effective migrants" from the captive

14   population into the wild population contemplated by the 2015 10(j) Rule, FWS

15   "recommend[ed] a . . . minimum of 1 to 2 effective migrants per generation entering the

16   population, depending on its size, over the long term" but noted "[i]n the more immediate

17   future, [FWS] may conduct additional releases in excess of 1–2 effective migrants per

18   generation to address the high degree of relatedness of wolves in the [MWEPA

19   population]."  (FWS029993.)

20        Additionally, FWS clarified the legal "take" provisions to provide greater

21   management flexibility, make reintroduction compatible with human activities like

22   livestock grazing and hunting, and permit take in response to unacceptable impacts from

23   predation on wild ungulate herds.  (FWS029993, 029995; FWS030000; FWS029827; *see*

24   *also* N001500, N001514; N048579.)   The take provision related to predation on wild

25   ungulate herds was incorporated at least in part because Arizona requested it.  (*See*

26   N001500, N001514; *see also* N048579.)    The 2015 10(j) Rule's take provisions would

27   allow various entities to remove Mexican wolves under certain conditions.   None of the

28   2015 10(j) Rule's expanded taking authorizations included any safeguards to prevent

removal of genetically valuable wolves needed to rehabilitate the gene diversity of the wild population.  (FWS033878–80.)  Despite these changes, FWS did not revisit "the issue of whether or not the experimental population is essential to survival of the species in the wild," and noted "nothing in the rule change[d] the designation of the population."  (FWS030026.)

After a group of plaintiffs challenged the 2015 10(j) Rule, a judge in this District ruled in 2018 the 2015 10(j) Rule "fails to further recovery" of the Mexican wolf, primarily "by failing to provide for the population's genetic health" in the long term, and therefore violates the ESA.  *Jewell*, 2018 WL 1586651, at *13, 17.  Furthermore, the court determined FWS could not continue to rely on its 1998 "nonessential" determination for the experimental population but must instead make a new essentiality determination.  *Id.* at *19.  As a result, the court remanded the 2015 10(j) Rule to FWS to correct these errors but allowed the Rule to remain in effect during the remand period.  *Id.* at *23.

### d.  The 2017 Recovery Plan & 2022 10(j) Rule[2]

In late 2015, as the litigation regarding the 2015 10(j) Rule was ongoing, FWS initiated a new recovery planning process, which involved input from various stakeholders, including scientists and the states of Arizona, New Mexico, Colorado, and Utah.  (FWS004517–18; FWS004627–28.)  This process culminated in the 2017 Recovery Plan, which included the following delisting criteria[3] for the Mexican wolf: (1) the U.S. population averages at least 320 wolves and the Mexico population averages at least 200 wolves over eight years, and each is stable or increasing; (2) the captive breeding program releases a sufficient number of captive wolves into the wild, resulting in at least 22 released wolves in the U.S. and 37 released wolves in Mexico surviving to "breeding age"— regardless of whether they actually breed; and (3) adequate state, Tribal, and Mexican regulations are in place to limit human-caused mortality.  (FWS030480–82, 030500–02.)

Leading up to the rulemaking at issue, conservation biologists were split on the

---

[2] The 2017 Recovery Plan and the 2022 10(j) Rule are largely interconnected.
[3] FWS uses delisting criteria to determine whether threats to a listed species have been eliminated or controlled.

recovery strategy FWS should implement. This split began in 2010, when certain scientists on the Mexican wolf recovery team recommended establishing a metapopulation consisting of three wild populations in the United States in a draft recovery plan. (FWS038598–99.) This plan would require expanding the MWEPA north of the I-40. (*See id.*) FWS did not adopt this recommendation. Instead, in crafting the 2017 Recovery Plan, FWS used more current and comprehensive modeling and other data indicating recovery of the Mexican wolf is possible through a binational recovery strategy involving the MWEPA population and a wild population in Mexico. (FWS030480–82; FWS038598–99; FWS032673.) This modeling data arose from a population viability analysis (PVA) performed by Dr. Phillip Miller, in collaboration with FWS and with input from the participants in the recovery planning workshops (the "Miller PVA"). (FWS030486, 030502–06; FWS038096; *see also, e.g.*, FWS011320; FWS006018, FWS006019–100.)

Population viability models provide a way to investigate "current and future demographic dynamics of Mexican wolf populations." (FWS034826.) In a PVA analysis, "[t]he need for and consequences of alternative management strategies can be modeled to suggest which practices may be the most effective in managing Mexican wolf populations." (*Id.*) The Miller PVA used a computer program called *Vortex* to simulate future Mexican wolf population dynamics in the MWEPA and in Mexico based on a set of assumptions. (FWS038096–97.) *Vortex* has been shown to produce predicted population abundance trajectories consistent with monitored wildlife populations and other similar software platforms. (FWS034826.) While previous Mexican wolf modeling by Drs. Richard Fredrickson and Carlos Carroll relied on data from other wolf subspecies, such as wolves in the Greater Yellowstone Area, the Miller PVA gathered most of its data through direct observation of the Mexican wolf subspecies. (FWS034825.) In addition, the PVA included a "captive population component to the metapopulation model," which allowed Dr. Miller to incorporate the pedigree of all living wild and captive Mexican wolves. (*Id.*)

After starting with a baseline of pedigree information for the existing populations, the *Vortex* program simulated an annual series of life-cycle events (e.g., reproduction and

death) and management actions (e.g., removals, translocations, and captive releases) to project what could happen to those populations in subsequent years. (FWS038097–98, FWS038104, FWS038107–11.)  In doing so, the Miller PVA used assumptions for parameters such as mortality rates, birth rates, and litter size.  (FWS038097–98, FWS038104.)  In identifying appropriate values for these parameters, Dr. Miller cited the results of field studies of the MWEPA population, as well as literature and modeling by Drs. Fredrickson and Carroll and other wolf researchers.  (FWS034827–32.)  The assumptions used in the PVA were largely drawn from historic data from the MWEPA population, as well as the status of the captive population and the wild population in Mexico. (FWS034826–27.)  Based on these assumptions, the PVA generated estimates of the wild population's likelihood of extinction and its level of gene diversity after 100 years, as well as its level of gene diversity compared to the gene diversity retained by the captive population after 100 years.  (*See* FWS034864–65.)

The Miller PVA used the same removal/mortality rate for both fed and unfed wolves even though participants in the recovery planning workshops agreed the model should incorporate higher mortality/removal rates for unfed wolves than fed wolves. (FWS005318.)  The participants in recovery planning workshops never arrived at a consensus as to what rate of mortality/removal would be appropriate.  (*Id.*)  Thus, Dr. Miller performed further test runs of the model that changed these and other parameters, reporting "fairly dramatic" results.  (FWS005319.)  The final model resolved this by lowering the overall mortality rate.

In addition to the Miller PVA, FWS relied on the 2017 Martinez-Meyer habitat-suitability assessment to support its choice to rely on Mexico for the second Mexican wolf population needed for long-term recovery.  (FWS030486, FWS030493, FWS030506; FWS038170.)

Following these years of research and in response to the 2018 remand from this District, FWS proposed a Revised 10(j) management rule (the "Proposed Revised 10(j) Rule") in October 2021.  (FWS022296.)  FWS drew the substance of the Proposed Revised

10(j) Rule primarily from the 2017 Recovery Plan.  FWS solicited comments from the public, adjusted parts of the Rule based on comments, and responded to those comments. Then, on July 1, 2022, FWS promulgated the Final Revised 10(j) Rule (the "2022 10(j) Rule").  (FWS032660–85.)

The Revised Rule included a new population objective, a new genetic objective, and new temporary restrictions on the use of three take provisions but maintained the experimental population's geographic boundary (the MWEPA/south of I-40) and determined the experimental population was still nonessential.  (*See generally* FWS032660–85.)  First, the population objective set a broad goal "to achieve and sustain a population average greater than or equal to 320 wolves in Arizona and New Mexico." (FWS032661.)  Specifically, this objective "must be achieved over an 8-year period" as follows: "the population must exceed 320 Mexican wolves each of the last 3 years of the 8-year period, and the annual population growth rate averaged over the 8-year period must demonstrate a stable or increasing population, as calculated by a geometric mean."  (*Id.*) Second, the genetic objective targeted enough captive wolf releases into the wild population to result in at least 22 released wolves surviving to breeding age. (FWS032662.)  This objective did not account for direct genetic measuring or whether any of those released wolves actually breed.  (*See id.*)  Third, the Rule "temporarily restrict[ed] the use of three take provisions from the 2015 10(j) rule: take on Federal land, take on non-Federal land in conjunction with a removal action, and take in response to an unacceptable impact to a wild ungulate herd."  (*Id.*)  Specifically, FWS would issue no take permits for unacceptable impacts on a wild ungulate herd until the genetic objective had been met and issue no permits under the other two take provisions unless annual benchmarks of progress toward the genetic objective were met or takings the previous year did not include the lethal taking of any released wolf that would have counted toward the genetic objective. (FWS022305.)  FWS expected to meet the genetic objective by 2030.  (FWS022302; FWS022304.)

After conducting a "fresh essentiality determination" as required by the remand,

FWS maintained the experimental population's nonessential designation, primarily relying on two factors. (FWS032664; *see also* FWS022310.) The first factor FWS considered was the "existence of a protected wild population [in Mexico] outside of the MWEPA." (FWS032664; *see also* FWS022311.) The second factor FWS considered was the captive breeding program and its ability to replace the entire wild population if lost. (*See* FWS032665.) FWS determined animals from captivity would be available for reintroduction to the wild to reestablish the population, noting "the captive population is more capable of producing genetically redundant wolves for release than it was in 1998, due to its increased size." (FWS022310; *see also* FWS032665.) FWS noted it had "the knowledge and logistical capability to re-start the population and manage it to contribute to the long-term conservation and recovery of the Mexican wolf." (FWS032664.) Lastly, FWS explored the hypothetical release scenarios assuming a loss, noting it would "seek to establish a base of released wolves representative of the gene diversity available in captivity." (FWS032664–65.) After considering these factors and determining the loss of all reintroduced Mexican wolves within the MWEPA is not likely to appreciably reduce the likelihood of survival of the subspecies in the wild, FWS determined this experimental population was nonessential.

### e. Supplemental Environmental Impact Statement

In May 2022, FWS published the final version of its Supplemental Environmental Impact Statement ("SEIS") for the 2022 10(j) Rule. (*See* FWS027756–996.) In the SEIS, FWS stated the purpose of the proposed action, i.e., promulgation of a revised 10(j) Rule, was "to ensure compliance with" the 2018 remand from this District. (FWS027758.) Furthermore, FWS stated the action was necessary "because the ruling directs" FWS to redress certain narrowly defined issues—"the population size and genetic needs required for long-term persistence of the Mexican wolf," "the relationship between expanded take of Mexican wolves and protecting against the loss of genetic diversity," and "a fresh essentiality determination"—as they pertain to ensuring "the experimental population provides for the long-term conservation and recovery of the Mexican wolf." (*Id.*) The

2022 SEIS supplemented the prior 2014 EIS and incorporated the 2014 EIS by reference where appropriate. (*Id.*) While comments on the Draft SEIS asserted FWS should take a "hard look" at the nonessential determination by analyzing the effects of an essential determination (FWS024897), the SEIS did not include an analysis of the environmental impacts related to the essentiality determination, noting the revised rule would include an essentiality analysis. (FWS027758.)

In the SEIS, FWS described five components of the 2015 10(j) Rule it would change with its new rule: (1) "the population objective for the number of Mexican wolves in the MWEPA," (2) "the number of releases of captive wolves into the MWEPA," (3) "the provision for take on non-Federal lands in the MWEPA," (4) "the provision for take on Federal land in the MWEPA," and (5) "the provision for take in response to unacceptable impacts to a wild ungulate herd in the MWEPA." (FWS027758–59.) The SEIS analyzed three alternatives in detail, each of which changed at least one of these components. (FWS027759–61.) The SEIS also considered several alternatives but eliminated them from detailed consideration. (FWS027774–78.) For example, FWS eliminated an "[a]lternative that includes no take/removal provision for wolf dispersal across any specific boundary, in particular dispersal and inhabitance north of I-40." (FWS027776.) FWS "eliminated this alternative from further consideration because it does not promote flexibility in the management of Mexican wolves in the MWEPA" and "it is outside the scope of revisions necessary to respond to" the 2018 Remand Order. (*Id.*)

## II. Standard of Review Under the Administrative Procedure Act (APA)

Summary judgment is a particularly appropriate tool for resolving claims challenging agency actions, i.e., "deciding the legal question of whether the agency could reasonably have found the facts as it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985); *see also Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc). Therefore, instead of performing traditional review of summary judgment motions under *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), and Federal Rule of Civil Procedure 56, judicial review of an agency action under the ESA and the National

Environmental Policy Act (NEPA) at the motion for summary judgment stage proceeds under the APA. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014); *see also* 5 U.S.C. § 701 *et. seq.*

The APA directs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation and internal quotation marks omitted). Even if the record reflects an agency has made mistakes, the challenging party bears the burden of persuasion, meaning it must demonstrate the agency's conclusions are unreasonable. *Ctr. for Cmty. Action & Env't Just. v. FAA*, 18 F.4th 592, 599 (9th Cir. 2021). Accordingly, the Court should only overturn agency action when the challenging party meets its burden and shows the action:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Ultimately, courts must "ensure that the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011) (quoting *Nw. Ecosystem All.*, 475 F.3d at 1140).

## III.    Relevant Law

### a.    The Endangered Species Act (ESA)

Congress enacted the ESA "to provide a program for the conservation of . . . endangered species." 16 U.S.C. § 1531(b). Accordingly, the ESA's provisions

require "all Federal departments and agencies" to "seek to conserve endangered species" and "utilize their authorities in furtherance of the purposes of" the ESA. § 1531(c)(1). One way of doing this is, under Section 10(j)[4] of the ESA, FWS can reintroduce experimental populations if they "will further the conservation of [the] species." 16 U.S.C. § 1539(j)(2)(A). When FWS uses its power under Section 10(j) to reintroduce experimental populations, each member of the population generally "shall be treated as a threatened species," § 1539(j)(2)(C), which makes them subject to "such regulations as [FWS] deems necessary and advisable to provide for the conservation of such species," 16 U.S.C. § 1533(d). Thus, any regulations issued to manage experimental populations under Section 10(j) must generally aim to provide for the conservation of the species. *Cf. Sierra Club v. Clark*, 755 F.2d 608, 612–13 (8th Cir. 1985) (noting the extent of the Secretary of the Interior's discretion under another section of the ESA is limited because "the regulations . . . must provide for the conservation of threatened species").

"Before authorizing the release of any" experimental population, the Secretary must "determine, on the basis of the best available information, whether or not such population is essential to the continued existence of an endangered species or a threatened species." 16 U.S.C. § 1539(j)(2)(B). Therefore, any 10(j) rule must provide "[a] finding, based solely on the best scientific and commercial data available, and the supporting factual basis, on whether the experimental population is, or is not, essential to the continued existence of the species in the wild." 50 C.F.R. § 17.81(c)(2) (2022).[5] An "essential experimental population" is one "whose loss would be likely to appreciably reduce the likelihood of the survival of the species in the wild." 50 C.F.R. § 17.80(b). "All other experimental populations are to be classified as nonessential." *Id.*

**b. <u>National Environmental Policy Act (NEPA)</u>**

NEPA "promotes its sweeping commitment to 'prevent or eliminate damage to the environment . . .' by focusing Government and public attention on the environmental

---

[4] 16 U.S.C. § 1539(j).
[5] Because the regulations in effect at the time of the rulemaking govern, the Court will refer to regulations in effect in 2022 throughout but will not include the year.

effects of proposed agency action." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989) (quoting 42 U.S.C. § 4321). When an agency proposes an action to address a need, the NEPA process begins and the agency must determine which level of NEPA review it will pursue: an Environmental Impact Statement (EIS), an Environmental Assessment (EA), or a categorical exclusion (CE). *See* 40 C.F.R. § 1501.4. Under NEPA, agencies are required to prepare an EIS for any proposed federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS must address, among other things, the environmental effects—direct, indirect, and cumulative—of the proposed action. *See Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011).

## IV.    Discussion

Plaintiffs argue FWS violated the ESA and NEPA. The Court will first address Plaintiffs' arguments under the ESA and then their arguments under NEPA.[6]

### a.    **The Endangered Species Act (ESA)**

Lead Plaintiffs identify various arbitrary actions taken by FWS in violation of the ESA's recovery mandate, which generally fall into four categories: FWS's reliance on the Miller PVA and its allegedly flawed assumptions, FWS's use of a genetic surrogate/proxy, conditioning the take provisions on the genetic measure, and setting the upper I-40 boundary. (Doc. 56 at 22.) Additionally, Consolidated Plaintiffs contend FWS's nonessential determination violates the ESA. (Doc. 59 at 22–43.) The Court will address Lead Plaintiffs' ESA challenges to the modeling underlying and objectives of the 2022 10(j) Rule in Section IV(a)(i)–(iv) and will address Consolidated Plaintiffs' ESA challenge to the nonessential determination in Section IV(a)(v).

#### i.  *The Miller PVA*
1.  FWS's Reliance On The Miller PVA & Its Assumptions

First, Plaintiffs contend FWS arbitrarily relied on a model that incorporated

---

[6] Intervenor-Defendant Arizona has filed cross-motions for summary judgment in both cases. However, these cross-motions overlap substantially with arguments of Federal Defendants in both cases. Therefore, the Court will focus its discussion on the other motions unless it finds an analytical reason to explicitly mention Arizona's arguments.

irrational assumptions and underestimated extinction risk and genetic loss.  The Miller PVA's scenario upon which the 2022 10(j) Rule was based relied on the assumption that feeding rates would gradually decline from 70% of packs being fed to 15%, and then remain at 15% for the remainder of the 100-year simulation.  This scenario used a mortality rate of 24.9%, which FWS deemed conservative given the documented mortality rate.  (Doc. 64 at 24; *see also* FWS034865; FWS027982.)  From 2009 to 2015, the mortality rate was 18.9%, and, in recent years, the MWEPA population has maintained a mortality rate below this level.  For example, the mortality rate was 11.7% in 2019, 21% in 2020, and 18% in 2021.  (FWS038778, FWS038835, FWS039128.)  However, participants in the recovery planning process and commenters noted the model should incorporate higher mortality/removal rates for unfed wolves than fed wolves.  (FWS005318.)  Recovery workshop notes reflect this general agreement but noted the group "did not agree on how much."  (*Id.*)  Ultimately, the Miller PVA did not incorporate different mortality/removal rates for fed versus unfed wolves, as participants suggested it should.

However, in response to these concerns raised during recovery workshops, Dr. Miller modeled another set of scenarios in which diversionary feeding was eliminated entirely and included these analyses as an addendum to the PVA.  (FWS038657; *see also* FWS034871–76.)  Dr. Miller noted, in these model simulations, the MWEPA population would not achieve its recovery goals in the absence of diversionary feeding *if all other model assumptions from the primary scenario remained the same*.  (*See* FWS034873–75.)  Therefore, Dr. Miller next explored whether other model metrics could be changed to sustain viable populations without diversionary feeding.  (FWS034874–75.)  Dr. Miller found FWS could achieve long-term demographic stability and its genetic diversity target when the annual adult mortality rate was reduced from 24.9% to 20.9%.  (FWS034875.)  These results "indicate that populations can remain viable in the absence of diversionary feeding with reduced wolf mortality . . . ."  (FWS038654.)

Plaintiffs argue the modeled mortality rate of 20.9%, assuming no diversionary feeding, is unreasonable and reduced diversionary feeding will result in a spike in mortality

rates.  (Doc. 56 at 26–27.)  Yet Plaintiffs point to no scientific evidence establishing a consensus on the impact of diversionary feeding on mortality rates to support their claim that Dr. Miller's assumption of a mortality rate of 20.9% with no diversionary feeding in an alternate scenario under the model was unreasonable.  Instead, they generally argue there could be some impact of an undisclosed magnitude based on their review of the mortality rates during years of increased diversionary feeding.  The Court declines Plaintiffs' invitation to find arbitrary and capricious FWS's decision to not *arbitrarily* set some unknown differential mortality rate for unfed versus fed wolves in one modeled scenario.  The Court finds FWS's reliance on the modeled scenario and its management tools much more reasonable, and far surpassing the standards of the APA, than if it had relied on an arbitrary measure for fed versus unfed wolves in the alternate model scenario.  Rather than relying on conjecture, as Plaintiffs do, Lead Defendants provide a "full analytical defense" of this modeled scenario. *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1146 (9th Cir. 2015) (citation omitted).  Notably, FWS has accounted for further reductions or even eliminating diversionary feeding altogether by studying release scenarios and management actions it can take to maintain the lower mortality rate and retain population levels.  (FWS038654.)

Additionally, Plaintiffs argue the PVA improperly assumed that at least 15% of wolves would be fed for the entire 100-year simulation.  (Doc. 56 at 26–27.)  Because the model incorporated an assumption that supplemental feeding boosts litter size, the 15% feeding assumption resulted in an enhanced level of reproduction for 15% of wolves for the entire 100 years simulated.  (FWS038100, FWS038103, FWS038160.)  Lead Plaintiffs argue this assumption of "perpetual" feeding is inconsistent with the ESA's recovery goal of creating "populations that are self-sustaining without human interference." *Trout Unlimited v. Lohn*, 559 F.3d 946, 957 (9th Cir. 2009).  First, contrary to Plaintiffs' suggestion, the Court finds a 100-year assumption does not equate to a "perpetual" assumption.  Nothing in the ESA requires FWS to create a self-sustaining population within a certain timeframe, so it follows that an assumption projected 100 years into the future

can still "further the conservation" of the species.  *See* 16 U.S.C. § 1539(j)(2)(A).  Second, Plaintiffs cite no legal authority to support their claim that an *input* into a model upon which a 10(j) rule is based must "further the conservation" of a species.  In the absence of such authority, the Court finds FWS can incorporate a minimal level of diversionary feeding as a management tool into its model without running afoul of the ESA and APA.

Second, Plaintiffs assert the Miller PVA failed to incorporate any inbreeding effects on litter size, despite acknowledging some inbreeding impacts "may currently be masked" by supplemental feeding and noting detection of inbreeding impacts is difficult.  (Doc. 56 at 28; *see also* FWS038100.)  Additionally, Plaintiffs contend FWS failed to explain why it disregarded Dr. Fredrickson's findings to the contrary.  (Doc. 56 at 28.)  In response, Defendants note Dr. Fredrickson's findings conflicted with newer studies performed by researchers Clement and Cline.  (*See* Doc. 64 at 26.)  Because of this, Defendants note FWS biologists and the Recovery Planning Workshop participants agreed to omit inbreeding depression on litter size from the PVA's assumptions.  (*Id.*)

In support of their argument that FWS ignored Dr. Fredrickson's findings, Plaintiffs cite *Center for Biological Diversity v. Zinke*, 900 F.3d 1053 (9th Cir. 2018).  In that case, the Ninth Circuit concluded "FWS acted in an arbitrary and capricious manner" by "ignoring available data" showing a decline in effective breeders when finding the fluvial arctic grayling population was increasing as part of a listing decision under the ESA.  *Id.* at 1068.  There, FWS stated during the litigation it had relied on "more current" yearly data rather than the older, longitudinal study.  *Id.* at 1068–69.  Nevertheless, the Ninth Circuit reasoned "the listing decision should have included 'adequate explanation and support for its determinations.'"  *Id.* (quoting *San Luis*, 747 F.3d at 625).  Moreover, the Ninth Circuit noted FWS failed to provide a "reasonable explanation for adopting its approach" by not discussing the conflicting study's data.  *Id.* at 1069 (quoting *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 679 (9th Cir. 2016)).  Ultimately, FWS's arguments there failed because they served as post-hoc rationalizations rather than rationalizations articulated by FWS during its decision-making process as reflected in the administrative record.  *See*

*id.* ("[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself, not post-hoc rationalizations." (alteration in original) (quoting *Greater Yellowstone Coal.*, 665 F.3d at 1027 n.4)).

Unlike FWS's post-hoc rationalizations in *Zinke*, the administrative record here reflects FWS's contemporaneous explanation as to why it would not incorporate Dr. Fredrickson's findings on the effects of inbreeding on litter size into the Miller PVA. (*See, e.g.*, FWS038657.) As the Miller PVA itself explained, any inbreeding effects on litter size were indeterminate because they may be "masked by confounding factors such as the presence of diversionary feeding." (FWS038100.) Additionally, because FWS had not documented negative effects on litter size related to inbreeding in the MWEPA (FWS030434), it was even more reasonable for FWS to reject Dr. Fredrickson's older analysis performed under substantially different diversionary feeding conditions. Accordingly, the Miller PVA's assumptions on litter size and the effect of inbreeding were reasonable because FWS considered, but eventually rejected, conflicting evidence.

Third, Lead Plaintiffs contend the Miller PVA's assumption that 78% of adult females would pair with a mate each year (the "female pairing rate") was overly optimistic. (Doc. 56 at 28.) FWS arrived at this assumption by averaging two female pairing rates derived from Mexican wolf data. (FWS034879–81.) The first rate—86%—was based on a dataset of "[d]irect observations of paired status" of radio-collared female wolves in the MWEPA. (FWS034879–80.) FWS noted this rate "may be biased high" due to a sampling method that prioritized "breeding adults." (*Id.*) The second rate—69%—was based on the number of females in the entire population (collared and non-collared) compared to the estimated number of pairs in the population. (FWS034880.) FWS characterizes this as an indirect measure of the female pairing rate. (*Id.*)

The Court finds FWS's use of a 78% female pairing rate as set forth in the Miller PVA was not arbitrary and capricious. A response to a comment regarding this pairing rate highlights why FWS's choice was reasonable:

Once a female is paired (78% of the time), she then has a probability of

producing a detectable litter in that year of approximately 70%. Taken together, the probability of a given adult female pairing and producing pups in a year is about 50%, which is the same value used in the previous Carroll et al. (2014) analysis.

(FWS038656.)  Plaintiffs contend FWS should have relied on evidence from other wolf populations, which reflect a mean pairing rate of 68%, instead of averaging the two rates to arrive at 78%, or should have explained its decision better.  (*See* Doc. 56 at 29.) However, regardless of whether the specific percentage itself is reasonable, ultimately the result is the same as in Plaintiffs' preferred analysis, i.e., the Carroll PVA.  Because both the Miller PVA relied upon by FWS and Plaintiffs' preferred analysis conclude the probability of any adult female pairing and producing pups in a year is about 50%, the Court finds Plaintiffs' contention this female pairing rate is unreasonable unpersuasive. (*See* FWS038656 (citing Carroll et al. (2014).)

### 2.  The Rule's Genetic and Population Objectives

Plaintiffs contend the genetic and population objectives set by FWS would result in genetic decline, even ignoring the inherent "flaws" in the Miller PVA.  (Doc. 56 at 25, 29.) Specifically, Plaintiffs assert it was unreasonable for FWS to set objectives the Miller PVA predicted would allow the wild population to retain 90% of the genetic diversity from the captive population after 100 years.  (*Id.* at 29–30.)  Instead, Plaintiffs assert FWS should have either set the objectives at levels to result in 90% of the then-current level of diversity in the captive population or in the wild and captive populations combined.  (*Id.*)  In response, Defendants mention Plaintiffs fail to explain how the population objective would result in genetic decline and highlight the unavoidable genetic struggles inherent in the population's origin of only seven wolves.  (Doc. 64 at 29.)

The Court finds Plaintiffs' argument falls flat.  Recovery planning notes reflect, when the genetic objective concerns were raised, FWS addressed them by noting the limited genetic diversity it had to work with and the need to establish an attainable genetic metric.  (FWS012060–61.)  Plaintiffs never explain how FWS could have overcome the founders' initial genetic limitations, and to what degree, so their argument appears to be

1  that FWS should have set an unattainable genetic metric. But that too would fail to

2  "conserve" or "recover" the Mexican wolf. Plaintiffs seem to ask this Court to rule that

3  FWS must promulgate a rule with objectives above and beyond biological possibility given

4  the natural limits of the founding population. However, nothing in the administrative

5  record warrants this approach, and it was reasonable for FWS to set the objectives it did in

6  the absence of evidence that higher genetic goals were attainable.

7          3.  How The Population and Genetic Objectives Account for Uncertainty in the

8             Model, If At All

9        Lead Plaintiffs argue the population and genetic objectives fail to account for

10  uncertainty in the model, specifically, the objectives incorporate no margin of safety or

11  "guardrails" based on the Miller PVA's limitations. (Doc. 56 at 33.) In response, Lead

12  Defendants note FWS "appropriately cushioned against the noted uncertainties in the PVA

13  by committing to continued monitoring of the MWEPA population and adjustment of

14  management strategies if recovery efforts fail to yield the predicted results." (Doc. 64 at

15  30.)

16        The Court finds FWS's decision not to control for some uncertainty in the Miller

17  PVA reasonable. A model is naturally limited because no scientific study can predict the

18  future, as Dr. Miller noted within the PVA. (*See* FWS034826 ("PVA methodologies such

19  as the *Vortex* system are not intended to give absolute and accurate 'answers' for what the

20  future will bring for a given wildlife species or population.").) Plaintiffs attempt to use

21  statements like this in the introduction to the Miller PVA and in comments from Dr. Carroll

22  to indicate the objectives should have been set even more conservatively than those within

23  the output of the modeled scenario. Specifically, Plaintiffs note the "Miller PVA's

24  predictions depended on maintaining adult removal/mortality below 20.9%[,] even after

25  supplemental feeding is ended and removal/mortality would be expected to increase."

26  (Doc. 56 at 33.) By failing to incorporate a condition related to mortality rate into the

27  Revised 10(j) Rule, Plaintiffs argue "FWS omitted a key guardrail against falling short of

28  the model's predictions." (*Id.*) Yet the question is not whether FWS should have adopted

a guardrail for mortality but whether it was arbitrary for FWS not to do so. Plaintiffs have not demonstrated it was arbitrary because FWS explained it would continue to study these impacts and incorporate new scientific information as it became available.

Additionally, although the Miller PVA did not include a comprehensive sensitivity analysis to evaluate the impact of parameter uncertainty (*see* Doc. 56 at 32; *see also* FWS034869), the Miller PVA considered many release scenarios and demographic information from the full genetic makeup of all living Mexican wolves in the United States, building upon Dr. Carroll's work from 2014. None of Plaintiffs' arguments indicate the uncertainties identified and failure to conduct a sensitivity analysis render the *objectives* unreasonable. Rather, Plaintiffs appear to want *different* objectives in the Rule based on assumptions in the PVA. FWS's omission of a mortality-based criterion was reasonable because no evidence in the administrative record indicates a PVA without a sensitivity analysis is required before it can be used to set a management objective. *Cf. Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 879 (9th Cir. 2009) (finding Secretary's conclusion that lizard population was not declining based on a study noting results could serve as "baseline for future monitoring" and "should be viewed with caution as [population estimates] were based on sparse data" unsupported by administrative record). Unlike in *Tucson Herpetological Society*, where the agency head made a factual finding that contravened a study in the administrative record, here, FWS used a study, noting its limitations (*see* FWS30374), to set management objectives in a rule. As Dr. Miller noted, "the complexity of this data analysis effort resulted in a long list of measurement uncertainties across a range of model input variables," and a "comprehensive examination of the impact of this range of uncertainty on population viability" might "significantly alter the strategic decisions proposed by the relevant management authorities to promote Mexican wolf recovery in the wild." (FWS038140.) Yet Plaintiffs fail to produce any scientific study indicating an exact impact of measurement uncertainties across these variables beyond the 2014 Carroll study relied upon in the Miller PVA. Because the impacts and extent of the uncertainty were unknown, FWS could not reasonably control

1    for them in the current rule.

2        ***ii.  Using Proxy Instead of Actual Outcomes for Genetic Objective***

3        Plaintiffs argue there is no reason actual genetic diversity could not be incorporated

4    into the genetic objective, rather than a proxy.  (Doc. 56 at 33–34.)  The proxy they refer

5    to is FWS's genetic objective—for 22 released wolves to survive to breeding age.  (*Id.* at

6    34.)  Plaintiffs critique this aspect of the Rule, noting it fails to consider whether these

7    wolves actually breed and reproduce to an extent that would "improve the wild

8    population's genetic status" and alleviate "the long-term genetic threat to Mexican wolf

9    recovery."  (*Id.*)  In response, Defendants argue the proxy is reasonable because it mirrors

10   reality.  (Doc. 64 at 33–34.)  Specifically, Defendants assert the assumption that releasing

11   genetically valuable wolves into the MWEPA will alleviate the threat posed by a lack of

12   genetic diversity "is particularly justified here because [FWS] cannot control breeding

13   events in the wild but can control the genetic makeup of wolves released from captivity

14   into the wild."  (*Id.* at 34; *see also* FWS030505.)  Moreover, Defendants contend "the

15   surrogate measure of genetic diversity 'does not exist in a vacuum' and is verifiable

16   through further studies and supplemental direct monitoring."  (Doc. 64 at 34 (quoting

17   *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1066 (9th Cir.

18   2004)).)

19       The Court finds Defendants' choice to use a proxy rather than a direct measurement

20   of genetic health reasonable because the proxy reflects reality and accounts for the inherent

21   limitations of conservation management.  *See Gifford Pinchot Task Force*, 378 F.3d at

22   1066.  As Defendants explain, using actual genetic health data is not as practicable as using

23   a metric that fairly predicts increased genetic health.  (Doc. 64 at 33–34.)  The Miller PVA

24   accounted for the assumption that not every released wolf will breed, and some released

25   wolves will breed more than once.  (*See* FWS030505.)  Studies of the Mexican wolf show

26   that a released female has a 97% likelihood of producing at least one litter if she survives

27   to age 6.  (FWS038664.)  This means that genetically valuable wolves strategically released

28   by FWS and surviving to breeding age have a very high probability of infusing their genetic

diversity into the wild population, thereby increasing genetic health.[7]  Therefore, the Court finds this genetic surrogate measure reasonable as a management strategy, especially where, as here, direct measuring poses challenges and the genetic surrogate rationally mirrors genetic health.

### iii.  Take Provisions Conditioned on Genetic Objective

Plaintiffs' argument on the take provisions relies heavily on the invalidity of the Rule's genetic objective (*see* Doc. 56 at 37), as the Court dispensed with above.  *See supra* Section IV(a)(ii).  Specifically, Plaintiffs assert the current Rule's take provisions fail to remedy the issue identified in the 2018 remand order, which "held that those take provisions—which allowed for expanded permitting of take on federal land, non-federal land, and in response to 'unacceptable impacts' to wild ungulate herds—'do not contain adequate protection for the loss of genetically valuable wolves.'"  (Doc. 56 at 37 (quoting *Jewell*, 2018 WL 1586651, at *15).)  Defendants respond "[t]hese temporary take restrictions will protect and contribute to the recovery of Mexican wolf genetic diversity" in several ways.  (Doc. 64 at 36.)

Having found the genetic proxy reliable, the Court finds FWS's take provisions reasonable.  The take options in the revised Rule are contingent upon achievement of the 22-wolf genetic objective, which FWS has shown will improve genetic diversity.  Therefore, the Court finds the 2022 Rule's take provisions contain adequate protection for the loss of genetically valuable wolves.  Unlike the take provisions in the 2015 version of the rule, which did not contain any protection against the loss of genetic diversity, the 2022 Rule's take provisions are in line with the ESA's conservation purpose and policy, and Plaintiffs have not shown they operate to disadvantage the Mexican wolf.

Nor have Plaintiffs explained why the take provisions are inadequate aside from their reliance on the genetic proxy.  Defendants note, "by reducing take, the likelihood that

---

[7] In their Reply, Plaintiffs note only 41% of two-year-old (adult) released females will survive to age six (breeding age), and "those that do are unlikely to live as long, breed as frequently, or have as many surviving pups as the Miller PVA irrationally projects." (Doc. 89 at 23; *see also* FWS038664.)  Plaintiffs' concerns about the 41% probability of a female wolf living until age 6 ignore how Dr. Miller arrived at and justified those calculations and how the genetic objective works.

genetically valuable released wolves contribute their genetic diversity to the experimental population increases," and "the 2022 10(j) Rule decreases the time necessary to reach the genetic objective" by approximately five years "compared to population management under the 2015 take allowances."  (Doc. 64 at 36; *see also* FWS027769, FWS027873; FWS032682; FWS030505.)    Additionally, as Defendants explain, "the temporary take restrictions permit [FWS] to improve the genetic diversity of the experimental population in the short-term while the population is smaller."  (Doc. 64 at 36–37; *see also* FWS027769.)  These justifications are sufficient to show the take provisions will further the conservation of the Mexican wolf and protect against genetic loss, especially in the short term where that protection is the most critical.  Therefore, the Court finds FWS did not act arbitrarily and capriciously in conditioning the take provisions on the genetic objective and the take provisions are a reasonable way to protect against loss of genetic diversity.

### iv.  I-40 MWEPA Boundary

Lead Plaintiffs contend experts advise that lo ng-term recovery of the Mexican wolf will require the establishment of a domestic metapopulation, rather than FWS's current approach based on a binational recovery effort.  (*See* Doc. 56 at 37–43.)  They also contend FWS's reliance on Martinez-Meyer (2017) was unreasonable because that study failed to evaluate the true status of the habitat in Mexico.  (*See id.* at 40–41.)  Lead Defendants assert the geographic boundary of the MWEPA is outside the scope of what FWS was required to consider on remand.  Nevertheless, they also argue, as to the merits of Lead Plaintiffs' contention regarding the boundary, FWS's "decision to maintain I-40 as the northern boundary of the MWEPA was a reasonable management choice that furthers the conservation of the species."  (Doc. 64 at 38.)

Here, the I-40 restriction is justified for several reasons.  Under the regulations in effect at the time the 2022 10(j) Rule was promulgated, the range of an experimental population was limited to the species' "probable historic range," except in the "extreme case that the primary habitat of the species has been unsuitably and irreversibly altered or

1    destroyed." 50 C.F.R. § 17.81(a).[8]  Evidence from the administrative record shows FWS

2    relied on the Martinez-Meyer study—a peer-reviewed and published habitat-suitability

3    analysis—to model the probable historical range of the Mexican wolf. (*See* FWS030193–

4    205; *see also* Doc. 64 at 38.)  The study used oral and published occurrence records and

5    climactic suitability analysis to identify the species' historical distribution in the United

6    States, synthesizing data from all historical records from Arizona, New Mexico, and

7    southwest Texas. (*See* FWS030193–97.)   In Arizona and New Mexico, historical

8    occurrence records revealed that Mexican wolves largely ranged south of I-40.

9    (FWS030197.) Thus, I-40 serves as a major geographic feature that clearly designates the

10   boundary for the experimental population within its historical range.  The Court finds this

11   boundary is reasonable as it reflects the Mexican wolf's historic range and allows FWS to

12   foster better partnerships with stakeholders, including the states, Tribes, and landowners.

13   (*See* FWS002535.)

14         Next, Plaintiffs attack FWS's reliance on its binational recovery effort as set forth

15   in the 2017 Recovery Plan to show the I-40 boundary is not justified.  Plaintiffs contend

16   FWS's reliance on Martinez-Meyer (2017) and the Miller PVA "to conclude that Mexico

17   could support a self-sustaining, long-term, genetically healthy Mexican wolf population"

18   was arbitrary and capricious because, in doing so, it ignored documented conditions in

19   Mexico and the limitations of these studies. (Doc. 56 at 41.)  First, Plaintiffs note Martinez-

20   Meyer failed to consider the import of land ownership, despite higher levels of private land

21   ownership in Mexico and the impact of private killing of wolves on mortality. (*See* Doc.

22   56 at 40.)  Second, Plaintiffs explain the Martinez-Meyer study lacked reliable data on the

23   density of potential wolf prey (i.e., deer and other ungulates) in Mexico, despite prey

24   availability being one of "the most important habitat attributes" for Mexican wolves.

25   (FWS038053; Doc. 56 at 40.)  Third, and most critically, Plaintiffs contend the documented

26

27         [8] Plaintiffs claim FWS's reliance on this regulation constitutes legal error because
     the "probable historic range" aspect is unsupported by the ESA itself. (*See* Doc. 56 at 43
28   n.8.)  However, regardless of whether this was a legal error, Plaintiffs fail to explain why
     it is unreasonable for FWS to rely on the "probable historic range" as a factor in
     determining the boundaries of the MWEPA.

conditions in Mexico were worse than the Miller PVA predicted.  (*See* Doc. 56 at 42.)  In response, Defendants note "[w]hether the Mexico population ultimately will contribute to the species' recovery is a question to be answered through a recovery plan for the species at large, not through a management rule for one experimental population."  (Doc. 64 at 42.)

The Court agrees with Defendants.  Despite challenges in Mexico, the Court finds these challenges do not render FWS's I-40 boundary arbitrary and capricious.  Plaintiffs do not point to current studies showing how allowing Mexican wolves to roam freely north of I-40 will further their conservation.  And even if they had done so, they do not explain how this freely roaming management style would comport with the regulatory requirements for an experimental population.[9]  Plaintiffs also do not make clear to what extent they think FWS should have expanded the boundary, aside from completely adopting Plaintiffs' preferred domestic metapopulation strategy, and they fail to point to current science in the administrative record supporting such an expansion.

Furthermore, even if the Court were inclined to support Plaintiffs' preferred domestic metapopulation management strategy, the Court "is not empowered to substitute its judgment for that of the agency" under the APA's "narrow" standard of review.  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *see also Tucson Herpetological Soc'y*, 566 F.3d at 879 ("[W]hen examining decisions made under conditions of scientific uncertainty 'a reviewing court must generally be at its most deferential.'" (citation omitted)).  In the absence of studies related specifically to the insufficiency of the I-40 boundary itself, Plaintiffs have failed to establish a nexus between the general critiques of the relevant studies as they relate to the Mexico population and the arbitrary nature of the I-40 boundary.[10]

. . . .

_____

[9] According to the regulations, a 10(j) rule must include means to identify the experimental population and measures to isolate/contain the population.   50 C.F.R. § 17.81(c)(1), (3).

[10] It appears Plaintiffs deem deficient any recovery strategy or assumption by FWS to preserve the Mexican wolf that does not comport with their preferred approach.  This creates an ongoing cycle of litigation and ignores the success FWS has had in conserving and repopulating the species.

1        *v.* **Nonessential Determination**

2        Consolidated Plaintiffs contend FWS's determination that the MWEPA

3   experimental population of Mexican wolves is "nonessential" to the continued existence

4   of the species violates the ESA because FWS (1) arbitrarily relied on the captive breeding

5   program, (2) failed to evaluate or analyze whether the captive breeding program is capable

6   of replacing the wild population if lost, (3) failed to rely solely on biological factors and

7   apply the best available science, and (4) arbitrarily relied on a struggling population in

8   Mexico.   (Doc. 59 at 22–43.)   In response and in their cross-motion, Consolidated

9   Defendants contend FWS's nonessential determination reasonably considered the

10  population of Mexican wolves in Mexico in 2022 and the captive population in the United

11  States.   (Doc. 78 at 24, 29.)   Additionally, Consolidated Defendants assert FWS's

12  nonessential determination did not consider improper factors.  (Doc. 78 at 38.)

13       Before authorizing the release of any experimental population, the Secretary of the

14  Interior must make an essentiality determination.  *See* 16 U.S.C. § 1539(j)(2)(B).   An

15  "essential experimental population" is one "whose loss would be likely to appreciably

16  reduce the likelihood of the survival of the species in the wild." 50 C.F.R. § 17.80(b).  "All

17  other experimental populations are to be classified as nonessential."  *Id.*  When an agency

18  promulgates 10(j) rules, therefore, it must explicitly make a "finding, based solely on the

19  best scientific and commercial data available, and the supporting factual basis, on whether

20  the experimental population is, or is not, essential to the continued existence of the species

21  in the wild." 50 C.F.R. § 17.81(c)(2); *see also* 16 U.S.C. § 1539(j)(2)(B); Endangered and

22  Threatened Wildlife and Plants; Experimental Populations, 49 Fed. Reg. 33885, 33890

23  (Aug. 27, 1984) ("Also inherent in th[e essentiality] determination is the consideration of

24  what the potential loss of the experimental population will have on the species as a

25  whole.").

26       "When specialists express conflicting views, an agency must have discretion to rely

27  on the reasonable opinions of its own qualified experts even if, as an original matter, a

28  court might find contrary views more persuasive."  *Marsh*, 490 U.S. at 378.  *But see Defs.*

1    *of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001) (noting a conclusion in the

2    absence of a satisfactory explanation is arbitrary).

3        First, the Court finds FWS reasonably relied on the captive breeding program.

4    Consolidated Plaintiffs attempt to use the ESA's conservation objective, which states

5    agencies must conserve species "in the wild," to argue FWS cannot rely on a *captive*

6    breeding program to further the conservation of the species.  However, this argument defies

7    logic and fails to consider the realities of reintroduction programs.  *Cf.* Endangered and

8    Threatened Wildlife and Plants; Revision to the Regulations for the Nonessential

9    Experimental Population of the Mexican Wolf, 80 Fed. Reg. 2512, 2550 (Jan. 16, 2015)

10    ("If importance to recovery was equated with essentiality, no reestablished populations of

11    a species would qualify for nonessential status.").  When promulgating ESA Section 10(j)

12    regulations in 1984 to facilitate designation of experimental populations, FWS expressly

13    contemplated consideration of captive populations when making essentiality

14    determinations.  *See* 49 Fed. Reg. at 33888 (indicating "[a]n 'essential' experimental

15    population will be a special case, not the general rule" because "there can be situations

16    where . . . individuals can be removed to provide a donor source for reintroduction without

17    creating adverse impacts upon the parent population," which "is especially true if captive

18    propagation efforts are providing individuals for release into the wild").  Practically

19    speaking, FWS would never be able to introduce nonessential experimental populations if

20    Plaintiffs' understanding of the conservation mandate prevailed.

21        Second, FWS properly evaluated and analyzed whether the captive breeding

22    program could replace the wild population in the event the experimental population is lost.

23    Specifically, FWS considered the growth of the wild and captive populations over time,

24    the ability of the captive population to replace the wild one, and the impact of genetic health

25    on whether the captive population could replace the wild one.  FWS addressed some

26    logistics of this hypothetical scenario, expressly outlining how it could use the captive

27    population to restart the experimental population if necessary.  (*See* FWS032665.)

28    Specifically, in its hypothetical release scenario assuming no wild population, FWS

1    indicated it would release packs, pairs, and individual animals, including adult wolves, over

2    several years to reestablish the population, working with its partners to support the natural

3    growth and expansion of the experimental population through adaptive management

4    strategies and tools like those it has utilized since the reintroduction began.  (*Id.*)

5         Plaintiffs list 10 items they assert FWS did not explore, but should have, in this

6    hypothetical release scenario.  (Doc. 59 at 32–33.)  Defendants contend they "evaluated

7    most items" on Plaintiffs' list, "including genetic diversity, logistics, and the captive

8    population's ability to supply wolves for reintroduction."  (Doc. 78 at 36.)  And, for those

9    factors FWS did not consider, like the wild population's alleged *in situ* evolutionary

10   adaptive changes, Defendants assert no studies existed on that topic in 2022.  (*Id.*)

11        FWS need not create new science to plan for hypothetical conservation actions

12   under the ESA.  *See, e.g.*, *San Luis*, 747 F.3d at 602 ("Where the information is not readily

13   available, we cannot insist on perfection: The best scientific data available, does not mean

14   the best scientific data possible." (cleaned up)).  Therefore, the Court finds the approach

15   detailed by FWS in the administrative record is reasonable, despite lacking the level of

16   detail Plaintiffs desire.  This approach is especially reasonable because it is exactly how

17   FWS has furthered the conservation of the species in the past, rescuing the species from a

18   nonexistent wild population to a thriving one.  Therefore, because of FWS's historic

19   success with this approach and its logistical analysis of how each population interacts, the

20   Court finds FWS provided sufficient information and reasoning from which to conclude it

21   could use the captive population to replace the wild one.

22        Plaintiffs assert FWS would need to consider the age of wolves in captivity, how

23   many are capable of release, and whether those wolves would fully replace the wild

24   population's gene diversity, among other things.  But requiring FWS to analyze these

25   specific details makes little sense when the demography of the captive population is ever-

26   changing, and no specific timeframe is clearly identified by the statute or regulations.

27   Moreover, Plaintiffs fail to link those considerations to the standard.  No evidence Plaintiffs

28   proffer indicates those considerations render the continued existence of the Mexican wolf

infeasible. *See* 16 U.S.C. § 1539(j)(2)(B). Nor do they provide a rationale for how these considerations indicate the loss of the MWEPA experimental population is "likely to appreciably reduce the likelihood of the survival of the species in the wild." 50 C.F.R. § 17.80(b). Plaintiffs ask a series of detailed questions to challenge the hypothetical release scenario as lacking reason:

> [I]f we lost all 200 wolves in the wild in the United States, how many captive wolves would need to be released in the first year, in the second year, and so on to result in a new experimental population? And over how long? Would it take another 20 years, or 30 years, or more to result in a population of approximately 200 wolves? And, if so, how will the genetic health of the captive population continue to change over that same period of time? None of these questions were asked or answered by [FWS].

(Doc. 87 at 21.) Yet just because FWS did not answer these questions does not mean they fail to provide a "reasoned basis" for their nonessential determination. Nothing in the ESA or APA requires FWS to answer questions about a hypothetical scenario with this level of detail before concluding an experimental population is nonessential. To require as much from FWS would result in continuous litigation as more creative and clever questions are proposed.

Lastly, Plaintiffs seem to assert Defendants should have run a release scenario under the Miller PVA assuming the presence of zero wild wolves to provide scientific support for the captive population's ability to replace the wild population. However, this is akin to asking FWS to create new science, and the Court declines to do so considering FWS's reasoned conclusion that the captive population could replace the wild one, if lost. The question is not whether FWS performed the best analysis or the analysis Plaintiffs deem more appropriate, but whether it performed an analysis.

Third, FWS relied on biological factors and applied the best available science. Although Plaintiffs contend FWS "based its nonessential determination on largely political or policy grounds rather than the best available science or biological factors as required by the ESA" (Doc. 59 at 12), the evidence they point to as support—FWS's consultation with appropriate state fish and wildlife agencies, local governments, etc.—is plainly what is

required under Section 10(j).  Importantly, any 10(j) rule must, "to the maximum extent practicable, represent an agreement between [FWS], the affected State and Federal agencies and persons holding any interest in land which may be affected by the establishment of" the experimental population.  50 C.F.R. § 17.81(d).  And, "[i]n a situation where an affected agency, organization, or individual refuses to cooperate on a reintroduction because of an essentiality designation," FWS has the discretion to "reevaluate the designation and, if the status remains unchanged, may withdraw the proposal" for reintroduction altogether.  *See* 49 Fed. Reg. at 33888.  This consultation is not only important from a management perspective but also to avoid increased risks to wolves in the absence of local stakeholder agreement.  Nothing about FWS's consultations with various stakeholders, which, at least in part, helps reduce Mexican wolf mortality by decreasing conflict, displaces its reliance on biological factors or the best available science.

Fourth, FWS reasonably relied on the population in Mexico.  Plaintiffs seem to imply there is a geographic limit to an analysis of the species as a whole under the relevant regulations, yet, when making essentiality determinations for other experimental populations in the United States, FWS routinely considers the presence of species in the wild in Mexico.  *See, e.g.*, Endangered and Threatened Wildlife and Plants; Establishment of a Nonessential Experimental Population of the California Condor in the Pacific Northwest, 86 Fed. Reg. 15602, 15608 (Mar. 24, 2021) (considering Mexico population in essentiality determination for California condor 10(j) rule); Endangered and Threatened Wildlife and Plants; Establishment of a Nonessential Experimental Population of Sonoran Pronghorn in Southwestern Arizona, 76 Fed. Reg. 25593, 25597 (May 5, 2011) (considering Mexico population in essentiality determination for Sonoran pronghorn 10(j) rule); Endangered and Threatened Wildlife and Plants; Establishment of a Nonessential Experimental Population of Northern Aplomado Falcons in New Mexico and Arizona, 71 Fed. Reg. 42298, 42301 (July 26, 2006) (considering Mexico population in essentiality determination for Aplomado falcon 10(j) rule).  Consolidated Plaintiffs do not point to any case striking these regulations down.  Nor do they cite any statute or regulation *prohibiting*

1    the consideration of the species' status outside of the United States.  Moreover, the Court

2    agrees with Consolidated Defendants—FWS could not have reasonably ignored the

3    presence of Mexican wolves in Mexico in its 2022 nonessential determination because that

4    reality was part of "the best available information" it was required to consider.  (*See* Doc.

5    78 at 25 (quoting 16 U.S.C. § 1539(j)(2)(B).)  Therefore, it was especially reasonable for

6    FWS to rely on this population, even though these wolves happen to exist south of the

7    United States border.

8    **b.  <u>The National Environmental Policy Act (NEPA)</u>**

9    Lead Plaintiffs contend FWS violated NEPA in promulgating the 2022 10(j) Rule

10    by: (1) failing to take the requisite "hard look" at the impacts of the Rule and ensure the

11    scientific integrity of its environmental analysis; and (2) failing to consider a reasonable

12    range of alternatives. (Doc. 56 at 44–45.)  Additionally, Consolidated Plaintiffs assert FWS

13    violated NEPA by failing to conduct a NEPA analysis of the essentiality determination.

14    (Doc. 59 at 44–45.)

15    ***i.  Hard Look***

16    Lead Plaintiffs assert FWS failed to take a hard look at the environmental impacts

17    of its decision in its SEIS by: (1) "grounding its Mexican wolf impacts analysis on the

18    flawed Miller PVA, which incorporated unjustified, overly optimistic assumptions and data

19    and as a result underestimated extinction risk and genetic loss," (2) "relying on the

20    scientifically unsound assumption that genetic problems would no longer threaten Mexican

21    wolf recovery if the wild population maintained 90% of the captive population's

22    deteriorated genetic diversity after 100 years," (3) "relying on the Miller PVA without

23    including buffers or guardrails to account for its uncertainties," (4) "failing to rationally

24    explain its choice of a model-based proxy for genetic recovery in lieu of actual genetic

25    outcomes," and (5) "failing to analyze the impact of precluding Mexican wolves from

26    dispersing and establishing populations north of I-40 and retaining the I-40 boundary based

27    on flawed and unreliable studies that incorporated incorrect assumptions, omitted relevant

28    factors, and were undermined by subsequent information that FWS failed to consider."

(Doc. 56 at 45.)  Lead Defendants respond FWS's assumptions and the Miller PVA's inputs and limitations were detailed in the record and FWS took a hard look at all the considerations raised by Plaintiffs.  (Doc. 64 at 43–44.)

"A court's inquiry, when reviewing whether an agency complied with NEPA, is whether the agency adequately considered a project's potential impacts and whether the consideration given amounted to a 'hard look' at the environmental effects." *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006) (quoting *Idaho Sporting Cong., Inc. v. Rittenhouse,* 305 F.3d 957, 963 (9th Cir. 2002)).  "[A]ll foreseeable direct and indirect impacts" must be considered during the agency's "hard look," without minimizing negative side effects.  *Id.* (citation omitted).  Moreover, NEPA requires agencies to "ensure the professional integrity, including scientific integrity, of the discussion and analysis" in an EIS.  42 U.S.C. § 4332(D).  However, when "an agency undertakes technical scientific analyses, as with the development of models to help analyze a problem, the court's deference to the agency's judgment is at its peak." *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1107 (9th Cir. 2016).

"NEPA does not require" the Court to "decide whether an [EIS] is based on the best scientific methodology available . . . ." *350 Mont. v. Haaland*, 50 F.4th 1254, 1271–72 (9th Cir. 2022).  Nor does NEPA require the Court to decide whose experts have more merit.  *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1333 (9th Cir. 1992) ("To set aside the [agency's] determination in this case would require us to decide that the views of [Plaintiff's] experts have more merit than those of the [agency's] experts, a position we are unqualified to take.").  Accordingly, NEPA does not require an agency to have an "unattainable [level of] scientific certainty"; instead, "explanations and acknowledgments" of any relevant limitations and impacts "are all that NEPA requires." *Idaho Wool Growers Ass'n*, 816 F.3d at 1109.

Here, FWS took a hard look at the likely effects of its action.  As a threshold matter, the Court notes many of Plaintiffs' arguments relate to the *substance* of FWS's hard look, not whether the *procedural* requirement of taking a "hard look" under NEPA was met.  *See*

*WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 924 (9th Cir. 2015) ("NEPA does not impose substantive obligations on the action agency."). As detailed above, the Miller PVA's assumptions were reasonable considering the available science. *See supra* Section IV(a)(i)–(iv). Because Plaintiffs' hard look attack is wholly intertwined with substantive aspects already dismissed above, the Court finds FWS took a hard look at the environmental impacts of its decision.

### ii. *Reasonable Range of Alternatives*

Lead Plaintiffs assert FWS's analysis of alternatives violated NEPA because (1) it only considered one "lawful" alternative and (2) it did not consider more wolf-protective alternatives. (Doc. 56 at 46–47.) In response, Lead Defendants note the Final SEIS—which considered three alternatives in detail, including a no-action alternative—was sufficient to meet NEPA's strictures. (Doc. 64 at 50.)

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E) (2022). "The range of alternatives that an agency must consider under NEPA is based on the purpose and need of the proposed agency action," *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 981 (9th Cir. 2022), and the agency is only required to consider alternatives "reasonably related to the purposes of the project," *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (citation omitted).

The focus of the reasonable alternatives analysis is on the "substance of the alternatives" rather than "the sheer number of alternatives considered" because there is no minimum number of alternatives an agency must consider. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005); *see also* 42 U.S.C. § 4332(C)(iii). "An agency need not . . . discuss alternatives similar to alternatives actually considered, or alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives . . . ." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 955 (9th Cir. 2008) (citation omitted). However, "[t]he existence of

a viable but unexamined alternative renders an [EIS] inadequate." *Westlands Water Dist.*, 376 F.3d at 868 (quoting *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 575 (9th Cir. 1998)).  In rejecting any alternatives, the agency must only "briefly discuss the reasons" why alternatives were "eliminated from detailed study." 40 C.F.R. § 1502.14(a). The Court will address the arguments related to the range of alternatives in the context of the highly deferential APA standard.  *See Nw. Ecosystem All.*, 475 F.3d at 1140.

Here, the Court finds FWS considered a reasonable range of alternatives.  In the Final SEIS, FWS considered in detail three alternatives: (1) the Revised 10(j) Rule; (2) an alternative with the population and genetic objectives of the Revised 10(j) Rule but retaining the take provisions from the 2015 10(j) Rule without any restriction on the progress towards the genetic objective; and (3) the "no action" alternative (i.e., the 2015 10(j) Rule).  (FWS027758–62.)  However, FWS also briefly explained other alternatives and reasons why they would be eliminated from further consideration.  (*See* FWS027774–78.)  To the extent Plaintiffs argue FWS should have discussed other alternatives in depth, rather than eliminating them from detailed consideration, their claim fails.  None of the authority they cite engages with this nuance, nor do they explain the level of detail sufficient to make discussion of these alternatives "reasonable."

Plaintiffs' argument boils down to this—FWS cannot evaluate only a no-action alternative and a proposed/preferred action alternative when the no-action alternative has already been determined insufficient by a court.  But none of the cases cited by Plaintiffs address the unique scenario where the SEIS for a revised rule has been issued after a prior version of the rule was remanded.  Plaintiffs cite *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 73 (D.D.C. 2012), for the proposition that unlawful alternatives cannot be reasonable alternatives to consider.  (Doc. 56 at 46–47.)  However, the district court in *Flaherty* was referring to alternatives that violated a statute, not alternatives that were aspects of a rule previously held partially inadequate by a court pursuant to a statute.

Similarly, Plaintiffs' challenge regarding the substance of the alternatives fails because they point to no evidence demonstrating the feasibility of their preferred

1    alternatives within the scope of the SEIS's purpose and need.  (Doc. 56 at 47–48.)  This

2    part of Plaintiffs' NEPA challenge centers on FWS's failure to consider in detail "any

3    alternatives that would expand the MWEPA north of I-40 or allow Mexican wolves to

4    inhabit areas north of I-40 without being captured and removed, set a larger population

5    objective, set a more aggressive and directly measured genetic objective, or include

6    adequate protections against the taking of genetically valuable wolves."  (*Id.* at 47.)

7    Defendants contend FWS satisfied NEPA by briefly discussing and eliminating from

8    detailed study these more wolf-protective measures.  (Doc. 64 at 41–42.)

9           In their Reply, Plaintiffs again assert FWS should have explored other alternatives.

10   Specifically, Plaintiffs assert "commenters proposed doubling the number of captive

11   releases required by the genetic objective by combining FWS's cross-fostering strategy

12   with releases of adult pairs with pups at the levels modeled in the Miller PVA."  (Doc. 89

13   at 33 (citing FWS024783–84).)  Plaintiffs contend "Dr. Carroll showed that combining

14   such releases with a higher population target would have been far better for the Mexican

15   wolf's genetic recovery than FWS's chosen course."  (*Id.*)  When eliminating a version of

16   this option from detailed study, FWS acknowledged releasing adult pairs with pups was

17   feasible and "could have beneficial effects on the gene diversity of the experimental

18   population" but stated FWS "currently prefer[s]" cross-fostering for various reasons,

19   including "higher support from local communities/livestock operators" and increased

20   capacity to release within a condensed timeframe.  (FWS027774–75.)  Because NEPA is a

21   procedural statute, and thus only requires a certain procedure, not result, Plaintiffs' claims

22   fail.  While NEPA requires viable alternatives to be examined in detail, not prematurely

23   dismissed, *see Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir.

24   2005), the Court finds Plaintiffs have not shown their proposed alternatives were

25   sufficiently viable to warrant further consideration or to render FWS's failure to more fully

26   analyze them arbitrary and capricious.  *Cf. Alaska Survival v. Surface Transp. Bd.*, 705

27   F.3d 1073, 1088 (9th Cir. 2013) (noting a court "cannot say that failure to consider [an]

28   alternative is improper without evidence showing the feasibility of the alternative").

1    Lastly, the Court finds FWS did not improperly exclude the north-of-I-40

2    alternatives by unreasonably narrowing the "purpose and need" for its action.  (*See* Doc.

3    56 at 47–48.)  Plaintiffs assert because the 2018 Remand Order held the 2015 10(j) Rule

4    as a whole fails to further recovery and expressly questioned the viability of the I-40

5    boundary, FWS improperly used the purpose and need[11] as a pretext to avoid its statutory

6    obligation to provide for the conservation of Mexican wolves.  (*Id.*)  While the Court agrees

7    that "statutory objectives . . . serve as a guide by which to determine the reasonableness"

8    of a scope of alternatives, *Westlands Water Dist.*, 376 F.3d at 866, the Court finds it

9    reasonable for FWS to limit its scope to the parts of the rule explicitly identified as

10    problematic in the 2018 Remand Order.  In this scenario, the agency is not writing on a

11    blank slate and, therefore, it is reasonable to narrow the alternatives to the problems

12    identified for remand.

13    ### iii.  *Essentiality Determination*

14    Consolidated Plaintiffs assert FWS failed to take a hard look at or evaluate a

15    reasonable range of alternatives by excluding the nonessential determination in the SEIS

16    analysis and thereby failing to conduct an effects analysis of the essentiality determination.

17    (*See* Doc. 59 at 43–47.)  They contend "[t]his evaluation should have included comparing

18    and contrasting an essential designation alternative against the nonessential alternative,"

19    which they believe are both reasonable alternatives.  (*Id.* at 47–48.)  Because of this,

20    Plaintiffs assert FWS arbitrarily failed to consider an important aspect of the problem and

21    violated NEPA's mandate to consider the environmental effects of its action, which include

22    effects of Section 4 critical habitat and Section 7 consultation requirements.[12]  (*See id.* at

23    _____

24    [11] As stated in the SEIS, the purpose of FWS's proposed action was "to ensure
compliance with the [2018 Remand Order]."  (FWS027758.)  The action "is needed
because the ruling directs [FWS] to redress the following narrowly defined issues": "the
25    population size and genetic needs required for long-term persistence of the Mexican wolf;
the relationship between expanded take of Mexican wolves and protecting against the loss
26    of genetic diversity; and to make a fresh essentiality determination." (*Id.*)

27    [12] Essential experimental populations are treated as threatened and are thereby
protected by the consultation requirements of Section 7 of the ESA, 16 U.S.C. § 1536, and
qualify for designation of critical habitat under Section 4 of the ESA, 16 U.S.C.
28    § 1533(a)(3)(A), whereas nonessential experimental populations generally do not enjoy
those same protections, *see* 16 U.S.C. § 1539(j)(2)(C).

45–49.)  In sum, Plaintiffs interpret NEPA as requiring FWS to proceed in its SEIS as if the population were essential, even though FWS had already found the population was nonessential according to a specific ESA standard.

In response and in their cross-motion, Consolidated Defendants contend FWS's essentiality determination, a finding required under the ESA as part of its 10(j) rule, is not subject to NEPA.  (Doc. 78 at 45.)  Because FWS was required by the ESA to decide whether the experimental population is or is not essential, Defendants assert FWS "has no ability to choose a no-action alternative."  (*Id.*)  However, by undertaking an EIS to analyze environmental impacts of other aspects of the 10(j) rule, Federal Defendants concede an EIS was required for the 10(j) rule as a whole and, specifically, its management objectives.  Because the rulemaking under Section 10(j) is a major federal action subject to NEPA, and no party disputes that, the question becomes to what extent FWS can exclude the essentiality determination underlying the 2022 10(j) Rule from its effects analysis contained in an EIS, and whether its justification for doing so was reasonable.

Although NEPA requires federal agencies to consider the impacts of major federal actions significantly affecting the environment, "inherent in NEPA and its implementing regulations is a 'rule of reason,' which ensures that agencies determine *whether and to what extent* to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process."  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 754 (2004) (emphasis added).  However, because "NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action, the considerations made relevant by the substantive statute driving the proposed action must be addressed in [the] NEPA analysis."  *Or. Nat. Desert Ass'n*, 625 F.3d at 1109 (citation and internal quotation marks omitted).  Therefore, if it is reasonably possible to analyze the consequences of an agency's action, the agency is "required to perform that analysis."  *Kern*, 284 F.3d at 1072.  Much of the caselaw in this area cited by the parties deals with whether an agency must complete an EIS when taking certain actions, not to what extent its EIS must cover a specific underlying analysis already performed pursuant to another

statute.[13]

Here, the Court finds it was reasonable for FWS not to analyze the environmental impacts of an essential designation alternative in the SEIS. Plaintiffs do not cite any study showing environmental impacts of consultation and critical habitat designation are quantifiable. Thus, they fail to establish how it would be reasonably possible to analyze the consequences of FWS's nonessential determination as compared to an essential determination. *See Kern*, 284 F.3d at 1072. While the Court can appreciate Plaintiffs' qualitative arguments about the hypothetical benefits of Section 4 critical habitat designation and Section 7 consultation, it is difficult to envision what FWS's alternative analysis of an essential designation would involve above and beyond just stating the additional legal mandates and protections. Therefore, Plaintiffs fail to establish there were environmental impacts, above and beyond those legal impacts under the ESA, of an essential alternative. Moreover, Plaintiffs fail to show the "essential" status was a "*viable but unexamined alternative.*" *Westlands Water Dist.*, 376 F.3d at 868 (emphasis added). The Court finds no basis in NEPA or the relevant caselaw to conflate legal outcomes mandated if FWS finds the experimental population "essential" as that term is defined in the ESA with environmental impacts of that finding. Even assuming there are some tangible environmental impacts associated with Section 4 and Section 7, Plaintiffs fail to explain how those impacts would bear a rational relationship to the biological facts underlying the essentiality determination.

Lastly, FWS sufficiently explained why it was eliminating this alternative from detailed consideration. NEPA does not clearly require FWS to investigate environmental impacts of the hypothetical consequences of an essential designation under other ESA

---

[13] *See Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*, 426 U.S. 776, 791 (1976) (holding Secretary need not prepare an EIS, despite taking a major federal action, when "a clear and fundamental conflict of statutory duty" exists under another statute); *Douglas County v. Babbitt*, 48 F.3d 1495, 1502 (9th Cir. 1995) (holding Secretary need not prepare EIS when designating critical habitat under Section 4(a) because "NEPA does not apply"); *San Luis*, 747 F.3d at 645 (holding FWS not required to comply with NEPA when issuing a BiOp under Section 7 subject to Bureau of Reclamation's adoption, which itself would be an action requiring an EIS); *Ramsey v. Kantor*, 96 F.3d 434, 446 (9th Cir. 1996) (holding issuance of an incidental take statement under Section 7 of the ESA is not exempt from NEPA and, therefore, agency must prepare an EA and possibly an EIS).

subsections, in the absence of any direct, measurable environmental impact.  Therefore, it was reasonable for FWS to briefly explain its elimination of this aspect of the rule from its NEPA analysis.  Accordingly, while the specific action at issue here, FWS's decision to exclude an essential alternative from its analysis in the SEIS of environmental impacts of the 10(j) rule, appears to be an issue of first impression, the Court finds FWS's decision does not render its SEIS unreasonable in violation of the APA and NEPA.

### c. **Judicial Notice**

Plaintiffs request this Court take judicial notice pursuant to Federal Rule of Evidence 201 of two documents pertaining to Plaintiffs' motions for summary judgment: (1) an excerpt from the Answering Brief for the Federal Appellees in *WildEarth Guardians, et al. v. Haaland, et al.*, Appeal Nos. 22-15029 and 22-15091 (9th Cir. Sept. 23, 2022); and (2) FWS's Mexican Wolf Recovery Program Progress Report #25 (August 2023).  (*See* Doc. 86.)  Under Federal Rule of Evidence 201, a court may take judicial notice of an adjudicative fact if it is "not subject to reasonable dispute," including those facts established by records from other state or federal court proceedings "if those proceedings have a direct relation to matters at issue."  *Trigueros v. Adams*, 658 F.3d 983, 987 (9th Cir. 2011) (quoting *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992)).  However, because "[i]rrelevant evidence is not admissible," Fed. R. Evid. 402, courts should decline to take judicial notice of irrelevant facts, *see, e.g.*, *Turnacliff v. Westly*, 546 F.3d 1113, 1120 n.4 (9th Cir. 2008).

Here, the scope of this Court's review is limited to the information available to the agency at the time of its decision, so the Court does not see how either document is relevant or material when evaluating whether summary judgment is appropriate under the APA.  Therefore, the Court denies Plaintiffs' request for judicial notice.

### V.    **Conclusion**

For the reasons above, Plaintiffs have not shown FWS's decision was arbitrary, capricious, or not in accordance with law.  *See* 5 U.S.C. § 706(2)(A).  The administrative record shows FWS considered numerous model scenarios under the Miller PVA and based

its 2022 10(j) Rule on the best available science.  None of the purported oversights noted by Plaintiffs render the Rule itself unreasonable.  Additionally, FWS took a hard look at the environmental impacts of the 2022 10(j) Rule and considered a reasonable range of alternatives.  Because Plaintiffs have not met their burden of demonstrating FWS's ultimate conclusions are unreasonable or were arrived at in an arbitrary manner, the Court will uphold FWS's 2022 10(j) Rule.

Accordingly,

**IT IS ORDERED** as follows:

1) In lead case No. CV-22-00303-TUC-SHR, Plaintiffs' Motion for Summary Judgment (Doc. 55) is **DENIED**.  Defendants' Cross-Motions for Summary Judgment (Docs. 63, 67) are **GRANTED**.

2) In consolidated case No. CV-22-00453-TUC-SHR, Plaintiffs' Motion for Summary Judgment (Doc. 58) is **DENIED**.  Defendants' Cross-Motions for Summary Judgment (Docs. 77, 81) are **GRANTED**.

3) Plaintiffs' Motion for Judicial Notice (Doc. 86) is **DENIED**.

4) The underlying agency action is **AFFIRMED**.

Dated this 31st day of March, 2025.

Honorable Scott H. Rash
United States District Judge